# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 00-1545/1546

_____

| | | |
|---|---|---|
| North Dakota State University, an agency of the State of North Dakota, | * * * | |
| | * | Appeals from the United States |
| Appellee/ | * | District Court for the |
| Cross-Appellant, | * | District of North Dakota. |
| | * | |
| v. | * | |
| | * | |
| United States of America, | * | |
| | * | |
| Appellant/ | * | |
| Cross-Appellee. | * | |

_____

Submitted: February 15, 2001
Filed: June 18, 2001

_____

Before RICHARD S. ARNOLD and HANSEN, Circuit Judges, and DAVIS,[1] District
 Judge.

_____

HANSEN, Circuit Judge.

---

[1]The Honorable Michael J. Davis, United States District Judge for the District
of Minnesota, sitting by designation.

The district court[2] entered summary judgment partially in favor of North Dakota State University and partially in favor of the United States in this Federal Insurance Contributions Act (FICA) tax case involving North Dakota State University's early retirement program. The district court determined that payments to tenured faculty under the program were not wages within the FICA definition of wages but that payments to high-level administrators under the program were wages subject to FICA taxation. The United States appeals the decision regarding the tenured faculty and North Dakota State University cross-appeals the decision regarding the administrators, to the extent it applies to those administrators who North Dakota State University asserts also had tenure rights. We affirm.[3]

I.

The material facts are generally undisputed in this case disposed of on cross motions for summary judgment. North Dakota State University (hereinafter "NDSU") offered an Early Retirement Program to tenured faculty and to certain high-level administrators whose age and years of service totaled 70 (or 65 during some periods of time). Participation in the program was voluntary by both parties–neither the employee nor NDSU could force the other to enter into an Early Retirement Agreement. Once they agreed to enter into an Early Retirement Agreement, NDSU and the employee negotiated the payment amount. The payment was capped at 100% of the employee's most recent annual salary, but the prospective retiree was not automatically entitled to the full amount. Various factors were considered in setting the

---

[2]The Honorable Rodney S. Webb, Chief Judge, United States District Court for the District of North Dakota.

[3]North Dakota State University also sought refunds for FICA taxes based on wages paid to teachers and trainees who were residents of other countries and were working at the university on J-1 work Visas. The district court denied the refund. North Dakota State University does not challenge that ruling on appeal.

retirement payment, including past performance, current salary, curriculum needs, and budget restraints. These were not the only factors considered during the negotiations; in fact, there was no restriction on the factors that could be considered. Under the Early Retirement Agreement, the employee agreed to give up any tenure, contract, and/or other employment rights, agreed not to seek employment with a North Dakota public university or college, and agreed to give up any claim against NDSU under the Age Discrimination in Employment Act.

The Early Retirement Program was available to faculty who had received tenure. Tenure was granted to a faculty member upon recommendation by NDSU to the North Dakota Board of Higher Education (the Board), which made the final tenure decision. NDSU had a tenure track of six years, during which time faculty members were evaluated annually. The six-year track was not set in stone, however, and occasionally tenure was granted earlier, even upon hire. Under NDSU and Board policy, the six-year probationary period could be waived for faculty having tenure at another university or having a record of outstanding achievement. The Board considered various factors in making tenure decisions, including scholarship in teaching, contribution to a discipline or profession through research, other scholarly or professional activities, and service to the institution and society.

Tenure was not a right that could be demanded by a professor. Once tenure was granted, however, tenure gave the professor the right to continuous academic year employment in the specific program area for which the tenure was granted. The annual tenure contracts were automatically renewed each year unless termination was permitted under the policies. Under the terms of the tenure program, which were non-negotiable, a tenured faculty member could be terminated based upon various fiscal reasons, including a demonstrably bona fide financial exigency, loss of legislative appropriations, loss of institutional or program enrollment, consolidation of academic units or program areas, or elimination of courses. Additionally, tenured faculty could be terminated for adequate cause, which was defined as demonstrated incompetence

3

or dishonesty in teaching, research, or other professional activities; continued or repeated unsatisfactory performance evaluations; substantial and manifest neglect of duty; conduct which substantially impaired fulfillment of responsibilities; physical or mental inabilities to perform duties; and continued violations of NDSU or Board policies. Absent fiscal constraints or adequate cause, a tenured faculty member could not be terminated. The tenure policies required that specific due process rights and procedures be afforded a tenured faculty before any termination.

Certain high-level administrators were also eligible to participate in the Early Retirement Program, including "the president, vice presidents, deans and officers of the institution who [we]re members of TIAA/CREF, TFFR and TIRF." (NDSU policy § 360, Appellant's App. at 14.) These administrators had certain employment rights pursuant to NDSU and Board policy, including a right to extended notice before dismissal, depending on the administrator's length of employment. Three months notice was required during the administrator's first year, six months during the second year, and twelve months notice thereafter. Upon compliance with the early notice provisions, the administrators could be terminated without cause. (NDSU policy § 183, Appellant's App. at 69-70).

Prior to 1991, NDSU withheld the employee's portion of FICA taxes from Early Retirement Program payments and paid its employer's share of FICA taxes. During 1991, some Early Retirement Program participants questioned NDSU's payroll department about the applicability of FICA taxes to the payments. Both NDSU's payroll director and general counsel researched the issue by reviewing privately published tax law treatises and attempting to contact the Internal Revenue Service (IRS) and the Social Security Administration (SSA).[4] NDSU posed a question to the

---

[4]The United States claims that NDSU never contacted the IRS. NDSU claims its general counsel talked to someone in the local IRS office and was directed to the SSA. Whether NDSU in fact contacted the IRS is immaterial to disposition of these

4

SSA concerning whether NDSU's "Tenure Buy-Out Program," under which "an employee is offered a sum of money to sell their Tenure back to the University," is considered wages for FICA purposes. (Appellant's App. at 83.) The SSA responded in a letter stating that, as described by NDSU, the program was "in effect, a payment to secure the release of an unexpired contract of employment," and as such, under the Social Security Procedure Operations Manuals, was not considered wages for purposes of determining benefit amounts or for deduction of benefits purposes. (Id.) Based on the SSA letter, and without seeking further outside advice or a private letter ruling from the IRS, NDSU stopped both withholding and paying FICA taxes on the Early Retirement Program payments.

The IRS audited NDSU on June 22, 1995, and assessed deficiencies in FICA taxes for the years 1991 through 1994 with respect to the Early Retirement Program payments. NDSU paid the assessment and thereafter began withholding and paying FICA taxes on the early retirement payments. NDSU later filed for a refund of the FICA taxes for the periods of 1991 through 1997. Upon denial of the refund claim, NDSU filed this suit.

The district court determined that the payments to the administrators were wages subject to FICA taxation because the administrators were at-will employees, subject only to the extended notice provisions. Because the payments were based on factors traditionally used to determine compensation, the district court found that the payments were wages for FICA purposes. The district court treated the tenured faculty members differently, however, because the faculty had a recognized property interest in their tenure. The district court concluded that the payments to tenured faculty were made in exchange for the relinquishment of a property or contract interest rather than for compensation and as such were not subject to FICA taxation. The United States appeals the ruling regarding the tenured faculty. Counsel for NDSU clarified at oral

cases.

5

argument that NDSU is appealing the ruling only to the extent that payments made to administrators who NDSU alleges also had tenure rights were deemed wages for FICA purposes. NDSU concedes that nontenured administrators were at-will employees and subject to FICA taxation. We affirm.

## II.

We review summary judgment dismissals de novo, applying the same standard as the district court. See Melvin v. Yale Indus. Prods., Inc., 197 F.3d 944, 946-47 (8th Cir. 1999). Tax assessments made by the IRS are presumed correct and the taxpayer bears the burden of proving, by a preponderance of the evidence, that the assessment is erroneous. See Boles Trucking, Inc. v. United States, 77 F.3d 236, 239 (8th Cir. 1996). The crux of this case is whether payments made to tenured faculty, in exchange for which the tenured faculty gave up their tenure rights, are subject to FICA taxes as defined by the Internal Revenue Code. This is, we believe, an issue of first impression in the federal circuit courts.[5]

The Internal Revenue Code imposes FICA taxes on "wages" received by an employee "with respect to employment." Internal Revenue Code (I.R.C.) § 3101, 26 U.S.C. § 3101. The employer is required to withhold FICA taxes from the employee's wages and is required to pay an equal amount itself as an employment tax. See I.R.C. §§ 3102, 3111. The term "wages" is defined for FICA purposes as "all remuneration for employment" with enumerated exceptions, none of which apply to this case. I.R.C. § 3121(a). "Employment" is defined as "any service, of whatever nature, performed by an employee for the person employing him." I.R.C. § 3121(b). These terms "are worded so as to 'import breadth of coverage,'" Mayberry v. United States, 151 F.3d

---

[5]Indeed, the only federal district court case to address the issue of FICA taxes on payments to tenured faculty for release of their tenure rights as far as we are aware is an unpublished decision from the Southern District of Texas. See Slotta v. Texas A&M Univ. Sys., 1994 US Dist LEXIS 21205 (S.D. Tex. Aug. 10, 1994).

855, 860 (8th Cir. 1998) (quoting Soc. Sec. Bd. v. Nierotko, 327 U.S. 358, 365 (1946)), to further the policies behind the Social Security Act as originally codified in 1935. See Nierotko, 327 U.S. at 364-66 (holding that "any service . . . performed" includes the whole employer-employee relationship and is not limited to only productive activity).

Although wages and employment are read broadly in the FICA context, clearly not all payments by employers to employees constitute wages. "Wages usually are income, but many items qualify as income and yet clearly are not wages." Cent. Ill. Pub. Serv. Co. v. United States, 435 U.S. 21, 25 (1978). The payments must be remuneration for services provided by the employee to his employer to be subject to FICA taxes.

Three closely related principles emerge from our review of the tax law relevant to this dispute. In Revenue Ruling 58-301,[6] an employee entered a five-year employment contract. See Rev. Rul. 58-301, 1958-1 C.B. 23.[7] The employer and the employee agreed to cancel the contract in the second year. The employer paid the employee a lump sum in exchange for the employee's relinquishment of his contract

---

[6]"Although revenue rulings do not have the force of law, they are entitled to respectful consideration, and are to be given weight as expressing the studied view of the agency whose duty it is to carry out the statute." United States v. Howard, 855 F.2d 832, 836 (11th Cir. 1988) (internal quotations and citations omitted); see also McMartin Indus., Inc. v. Vinal, 441 F.2d 1274, 1276 (8th Cir. 1971). Because there is no case law directly on point, we find revenue rulings especially useful in analyzing the issue before us.

[7]Despite the government's argument that Revenue Ruling 58-301 is of questionable authority, it concedes that the IRS has not withdrawn or otherwise overruled it and continues to follow it. See Gen. Couns. Mem. 38,098 (Sept. 19, 1979), 1979 WL 52981(confirming the IRS's continued approval of Rev. Rul. 58-301).

rights. The IRS determined that the lump sum payment was not FICA wages, or remuneration for employment, but consideration for relinquishing rights under the contract, i.e., the right to be employed for the full five years. Thus, in the view of the IRS, payments to relinquish rights under a contract are not wages for FICA purposes. See also Slotta, 1994 U.S. Dist. Lexis 21205, at *4-5 (holding that payment to a professor for relinquishing tenure rights was not wages for FICA purposes). Cf. Abrahamsen v. United States, 228 F.3d 1360, 1365 (Fed. Cir. 2000) (rejecting argument that exit incentive payments to at-will employees were in exchange for agreement to release all claims against employer where there was no evidence that employees ever asserted claims against the employer), cert. denied, 121 S. Ct. 1484 (2001); Associated Elec. Coop., Inc. v. United States, 226 F.3d 1322, 1328 (Fed. Cir. 2000) (rejecting argument that early-out payments made to mine workers were in exchange for agreement not to strike where payments were offered to all employees, including nonunion employees).

In Revenue Ruling 74-252 the IRS determined that payments made to an employee after his employer terminated his three-year employment contract were FICA wages. See Rev. Rul. 74-252, 1974-1 C.B. 287. The contract provided that the employer could terminate the employee during the term of the contract as long as it paid the employee an additional six months salary, which it did. The IRS distinguished Revenue Ruling 58-301 by characterizing it as payment for "the relinquishment of interests the employee had in his employment contract in the nature of property." Conversely, the case before the IRS in Revenue Ruling 74-252 involved payments made under the contract. Thus, in the IRS's view, payments made pursuant to an employment contract are wages for FICA purposes. See also Greenwald v. United States, 2000 WL 16939, at *4 (S.D.N.Y. Jan. 10, 2000) (holding that a lump-sum payment which essentially paid the employee for anticipated earnings pursuant to an employment agreement were FICA wages).

8

In Revenue Ruling 75-44, a railroad employee received a lump-sum payment in exchange for relinquishing seniority rights gained from his prior service under a general contract of employment. See Rev. Rul. 75-44, 1975-1 C.B. 15. The employee was an at-will employee who had acquired the rights to security in his employment and to additional pay or other recognition based on longevity; however, the railroad had no obligation to maintain the relationship. The railroad paid the employee a lump sum to transfer to a different position and to forego his seniority rights. The IRS determined that the lump sum payment constituted remuneration for services for purposes of the Railroad Retirement Tax Act (RRTA), the equivalent of FICA for railroad employees, because the rights given up were those earned by past service–or seniority. The payment was similar to a severance package, which rewarded an employee for past service. Thus, according to the IRS, payments for past services, or seniority rights, are wages for FICA purposes. See also Abrahamsen, 228 F.3d at 1364 ("If the payments at issue were merely severance payments that were not conditioned on a release of any claims, they would constitute 'wages' because they would be compensation paid to the employees by their employer for the employer-employee relationship.").

Thus, we must determine whether the payments made under NDSU's Early Retirement Program to tenured faculty in exchange for release of the faculty's tenure rights are payments to relinquish contractual or property rights, payments pursuant to a contractual agreement, payments for past services, or something else.

## A. Tenured Professors

The parties agree that tenure is a protected property right. In this circuit, a tenured professor at a state institution not only has a constitutional right to procedural due process, but also has "a substantive due process right to be free from discharge for reasons that are 'arbitrary and capricious,' or in other words, for reasons that are trivial, unrelated to the education process, or wholly unsupported by a basis in fact." Morris v. Clifford, 903 F.2d 574, 577 (8th Cir. 1990) (refusing to grant qualified immunity to

university personnel for discharging a tenured professor at the University of North Dakota because a tenured professor's right to substantive due process was clearly established); see also Mueller v. Regents of the Univ. of Minn., 855 F.2d 555, 559-60 (8th Cir. 1988) (requiring substantial evidence to support the university's decision to terminate a tenured professor protected by substantive due process). NDSU policy also provided that tenured faculty could not be terminated absent fiscal restraints or adequate cause. Thus, the faculty who gave up their tenure rights at NDSU in exchange for early retirement gave up the right not only to invoke proper procedure before tenure was lost, but a right not to lose tenure at all without justification.

Despite the fact that tenure at a state institution is a constitutionally protected property interest and that the tenured faculty had clear contractual rights not to be terminated absent specific circumstances, the government argues that tenure rights are not contract rights that can be relinquished because the tenure rights have no economic value that can be bought and sold. We are unpersuaded by this argument. Rarely would we expect to find an employment contract that would have recognizable economic value to anyone other than the employee.[8] Lack of a market in which to sell tenure rights does not prevent those rights from having value to the faculty member to whom tenure has been granted. Cf. Vail v. Bd. of Educ. of Paris Union Sch. Dist. No. 95, 706 F.2d 1435, 1451 (7th Cir. 1983) (Posner, J., dissenting) ("A contract that gives a teacher the right to be employed till he retires is special, for unless he is old or rich the present value of his tenure right is probably his biggest asset."), aff'd, 466 U.S. 813 (1984).

The government next argues that tenure rights accrue over time, similar to seniority, making this case analogous to Revenue Ruling 75-44. Although past service

---

[8]Indeed, counsel for the United States agreed at oral argument that the employment contract at issue in Revenue Ruling 58-301, payment for which the IRS found not to be subject to FICA taxes, could not be bought and sold.

plays a part in the decision to grant tenure, tenure is much more than a recognition for past services. Importantly, tenure is not automatic upon completing service for a specified time period, which is a hallmark of ordinary seniority rights. Prior to an award of tenure, a professor is employed pursuant to one-year contracts for a period of time, generally six years at NDSU. The six years during which a professor teaches before being granted tenure is not consideration for the grant of tenure. Rather, it is ordinarily a prerequisite for tenure and serves as a probationary period during which the university may evaluate the professor to determine whether he or she has the qualities necessary to be worthy of tenure. After serving the probationary period, the professor must still qualify for tenure through his or her scholarship, research, and service to the university and society. "The decision to award tenure rests on criteria that reflect the potential long-term contribution of the faculty member to the purposes, priorities, and resources of the institution, unit, and program." (NDSU policy § 352, Appellant's App. at 74.) At the end of the probationary period, the professor's contract is either not renewed and the professor discontinues teaching at the university, or the professor is granted tenure and a lifetime appointment, as long as the grounds for removal are not triggered. See generally Mayberry v. Dees, 663 F.2d 502, 514-16 (4th Cir. 1981) (discussing the tenure process in-depth, including the value of the probationary period as an evaluation tool), cert. denied, 459 U.S. 830 (1982).

A tenured professor, therefore, experiences two successive relationships with the university: the initial at-will relationship during the probationary period and the subsequent tenured relationship. They are two distinct relationships. The tenured position is "a significantly different status–effectively a new job." Mayberry, 663 F.2d at 516 (discussing the distinct differences between the relationship a professor has with the university during the probationary period and following the grant of tenure).

Thus, contrary to the government's argument that tenure rights are earned by past service to the university, tenure rights are established at the outset of the tenured relationship. Tenure is a recognition of contributions to the academic world and is given

11

in exchange for continuing contributions. Under NDSU and Board policy, tenure also serves the purpose of protecting academic freedom. It provides a secure forum for the germination, cultivation, and exchange of ideas without fear that expression of viewpoints will result in retribution. It is this unique relationship and its accompanying rights, formed only when and if tenure is granted, that give tenure its significance and value. Because we reject the government's underlying premise that tenure accrues over time and is similar to seniority, we reject its argument that Revenue Ruling 75-44 should control the outcome of this case.

The government also argues that the retirement payments are FICA wages because the amount of the payments was based in part on the employee's past performance and current salary. Although we have previously relied on the method used to calculate a payment to determine whether it is subject to FICA taxation, particularly when the payment is measured by factors traditionally associated with compensation, those cases involved at-will employees. See Mayberry, 151 F.3d at 860 (holding that payments in class action settlement of an ERISA claim to at-will employees were FICA wages where each class member's award was based on the member's length of service with the employer); The Lane Processing Trust v. United States, 25 F.3d 662, 665-66 (8th Cir. 1994) (holding that payments to employees, from a trust set up by their employer with the agreement that the trust funds would be distributed to employees who agreed to stay on at reduced wages, were FICA wages where the funds were allocated between the employees based on length of service and position with the company). The tenured faculty in the case at hand clearly were not at-will employees. They were protected by a contractual relationship with NDSU and by constitutional principles of procedural and substantive due process. Additionally, past performance and current salary were not the only factors considered in determining the amount of the early retirement payments; in fact, there was no limit on what factors could be considered. Thus, although the method used to calculate a payment is relevant to whether the payment is wages for FICA purposes, it is not dispositive, see Associated Elec., 226 F.3d at 1328, and we do not deem the inclusion of past

12

performance and current salary as some of the factors in the decisional mix here to be controlling in this case.

We also find the government's reliance on cases involving dismissal payments unavailing. Treasury regulations provide that "[a]ny payments made by an employer to an employee on account of dismissal, that is, involuntary separation from the service of the employer, constitute wages, regardless of whether the employer is legally bound" to make the payments. Treas. Reg. § 31.3401(a)-1(b)(4). See also Rev. Rul. 74-252, 1974-1 C.B. 287 (defining dismissal payments for FICA purposes the same as defined for withholding purposes in Treas. Reg. § 31.3401(a)-1(b)(4)). The terminations involved here were totally voluntary by both parties; it is uncontroverted that neither NDSU nor a tenured faculty member could enter an Early Retirement Program agreement unless the other party freely consented. This case clearly does not involve dismissal payments.

Under the terms of the Early Retirement Program, the tenured faculty received a negotiated amount of money in exchange for giving up their constitutional and contractual rights to tenure. In other words, they relinquished their tenure rights. They did not receive what they were entitled to under their contracts, which was continued employment absent fiscal constraints or adequate cause for termination. Rather they gave up those rights, making this case more analogous to Revenue Ruling 58-301 than to Revenue Ruling 74-252.[9] We hold that payments made to tenured faculty under

---

[9]This point distinguishes the faculty at issue in this case from the administrators who were entitled only to extended notice. Although we do not reach the issue of whether administrators who did not have any tenure rights were subject to FICA taxes because NDSU does not raise it on appeal, we were troubled by the fact that the negotiations with faculty were apparently not different from those conducted with administrators. However, the administrators were entitled to, at most, twelve months notice before termination. The faculty were entitled not to be terminated at all, unless certain circumstances were met.

NDSU's Early Retirement Program were made in exchange for the relinquishment of their contractual and constitutionally-protected tenure rights rather than as remuneration for services to NDSU.  Thus, the payments are not subject to FICA taxation.

## B. Administrators

NDSU contends that some administrators had tenure and should be treated the same as the tenured faculty.  The only evidence offered to support this factual allegation are bald assertions made in depositions.  Although affidavit or deposition testimony is sufficient to create a fact issue for summary judgment purposes, NDSU has never offered any documentary evidence of the administrators' tenure rights.  "When written documents are relied on, they must be exhibited in full.  The statement of the substance of written instruments or of affiant's interpretation of them . . . are not sufficient."  Sprague v. Vogt, 150 F.2d 795, 800 (8th Cir. 1945).  Statements in deposition testimony that the administrators were protected by tenure rights via contracts and/or policies are insufficient, without evidence of the contract or policy, to establish those rights as a fact.  See Washington Post Co. v. Keogh, 365 F.2d 965, 971 (D.C. Cir. 1966) (affirming grant of summary judgment where documentary evidence relied on in affidavits was not produced), cert. denied, 385 U.S. 1011 (1967).  As such, NDSU has failed to raise an issue of fact for this summary judgment proceeding.  See Fed. R. Civ. P. 56(e) ("Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith."); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001) (noting that Rule 56(e) requirements for affidavit testimony apply equally to deposition testimony).

Evidence to the contrary reveals that the administrators, who were non-classified employees according to NDSU's brief  (Appellee's Br. at 5) and subject to policy § 183 according to its deposition testimony (Thorsen Dep. at 30-32, Suppl. App. at 32), could be terminated without cause pursuant to the requisite extended notice period.  (NDSU policy § 183(1), Appellant's App. at 69.)  Tenure was limited to the academic unit or

program area for which it was granted and did not extend to administrative positions. (NDSU policy § 350.1(1)(c), Appellant's App. at 56.) "Tenured appointments recognize a right . . . to continuous academic year employment in an academic unit or program area . . .." (NDSU policy § 350.1(4)(b), Appellant's App. at 58.) NDSU has failed to establish that the administrators who were not on the academic staff were anything other than at-will employees entitled only to extended notice before termination. On this record, the administrators are not entitled to be treated the same as the tenured faculty.

## C. Deputy Tax Collector Defense

Finally, NDSU argues that to the extent any of the payments are subject to FICA tax, it is protected by the "deputy tax collector" defense, which protects an employer from liability for failing to withhold employment taxes from its employees when the employer lacks "precise and not speculative" notice of its duty to withhold. See Cent. Ill., 435 U.S. at 31 (noting that "the employer is in a secondary position as to liability for any tax of the employee"). The defense applies only to that portion of the FICA tax required to be withheld from the employee; it does not apply to the employer's primary obligation to pay its portion of the FICA tax. See, e.g., H B & R, Inc. v. United States, 229 F.3d 688, 692 (8th Cir. 2000) (reversing district court's judgment against the employer for taxes required to be withheld from the employee's wages, but not for FICA taxes the employer was required to pay, based on Central Illinois).

The district court found that payments to the administrators were subject to FICA taxation because the administrators were at-will employees and the payments were based on factors traditionally associated with compensation. (See Dist. Ct. Order, Add. at 10-12). NDSU does not appeal this decision, other than to argue that some of the administrators were additionally protected by tenure rights and thus should be treated similarly to the tenured professors rather than the other at-will administrators. Because we have rejected this argument as lacking any factual basis in the record, we

15

treat all of the administrators as at-will employees subject to extended notice rights, as did the district court.

NDSU withheld FICA taxes from all payments under the Early Retirement Program prior to 1991, when some participants questioned the practice. As discussed previously, FICA withholding is required for all wages paid to employees, and is broadly construed. The Supreme Court established in 1946 that the term "wages" includes the whole employer-employee relationship and is not limited to work actually performed. See Nierotko, 327 U.S. at 365-66. As discussed above, the IRS issued Revenue Ruling 75-44 in 1975, requiring RRTA withholding for payments made to an at-will railroad employee who received payments in exchange for his seniority rights. See 1975-1 C.B. 15. NDSU's only basis for arguing that its duty to withhold was not clear is that the administrators were paid under the same program as the tenured faculty, who had clear contractual and constitutional rights not to be terminated at all. This point establishes a significant distinction between the two groups of employees and does not support NDSU's decision to stop withholding from payments to the administrators. Additionally, NDSU's reliance on the letter received from the SSA does not further its decision to stop withholding from payments made to the administrators. NDSU requested information from SSA regarding its tenure buy-out program, not regarding the administrators who also participated in the program. NDSU's obligation to withhold FICA taxes from payments made to at-will administrators, subject only to extended notice prior to termination, was clear in 1991. NDSU is liable for its failure to withhold FICA taxes from payments made to the administrators for the periods between 1991 and 1995, when it did not withhold the taxes.

## III.

For the foregoing reasons, we affirm the district court's judgment.

A true copy.

Attest:

           CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.