Donald F. **APPOLONI, Sr., Russell C. Bergemann, and Sandra Engel, individually and as representatives of all similarly-situated individuals. Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 5:02–CV–176.

United States District Court, W.D. Michigan, Southern Division.

July 21, 2004.

Suzanne Krumholz Clark, Amberg, Firestone & Lee, P.C., Southfield, MI, for plaintiffs.

Thomas P. Cole, U.S. Department of Justice, Tax Division, Washington, DC, for defendant.

### *OPINION*

QUIST, District Judge.

In this class action, Plaintiffs and class representatives, Donald F. Appoloni, Sr., Russell C. Bergemann, and Sandra Engel, are retired public school teachers who allege that they exchanged their property rights of tenure under Michigan law in

exchange for payments of money by their employer. Plaintiffs' employer withheld taxes on those payments under the Federal Insurance Contributions Act ("FICA"), and Plaintiffs filed claims for refunds of the FICA tax. On November 21, 2002, after the Internal Revenue Service ("IRS") denied Plaintiffs' administrative claims, Plaintiffs filed this action on behalf of themselves and all others similarly situated in the Western District of Michigan against the United States ("Government") for refund of the FICA taxes assessed on the payments they received in exchange for their property rights. By Order dated June 18, 2003, as amended by Order dated October 16, 2003, the Court granted Plaintiffs' motion for class certification and certified a class pursuant to Fed.R.Civ.P. 23(b)(3). Now before the Court are the parties' cross motions for summary judgment.

## I. *Facts*

Plaintiffs were formerly employed as public school teachers by the Dowagiac Union School District (the "District") and were all tenured employees under the Michigan Teachers' Tenure Act (the "Tenure Act"), M.C.L. §§ 38.71 to 38.191. Under the Tenure Act, a teacher is granted tenure after satisfactorily completing a four-year (formerly two-year) probationary period of employment. M.C.L. § 38.81. A teacher who has received tenure may be discharged or demoted "only for reasonable and just cause and only as provided in [the Tenure Act]." M.C.L. § 38.101. Plaintiff Appoloni obtained tenure in 1990, Plaintiff Bergemann obtained tenure in 1970, and Plaintiff Engel obtained tenure in 1975.

In 2001, the District offered certain teachers a monetary incentive to take early retirement under the Employee Severance Plan ("ESP"). Eligible teachers who elected early retirement under the ESP would receive one year of salary (up to $53,021) to be paid in monthly installments over five years. The ESP was incorporated into the Master Contract Agreement between the District and the Van Buren County Education Association and the Dowagiac Education Association. The purpose of the ESP was "to help prevent teacher layoffs and to lessen the Board's economic responsibility in the area of staffing." (Master Contract Agreement at 45, Cole Decl. Ex. 1.) The ESP was entirely voluntary, was available to only the first thirty teachers who applied, and required a minimum of fifteen applicants in order to trigger the District's obligations under the ESP. To be eligible, a teacher had to have ten years of service with the District and be at the top of the pay scale. In addition, an interested teacher was required to declare his or her intention to participate in the ESP by January 9, 2001, and to continue teaching until no later than June 2001. Applicants were also required to complete an Indication of Interest Form, a Release and Waiver of Claims Agreement, a Notice of Enrollment, and a Designation of Beneficiary Form. (ESP Plan Description ¶ 5, Cole Decl. Ex.2.) The Release and Waiver of Claims Agreement contained a broad waiver, pursuant to which the employee waived all claims arising out of employment with the District, including claims that the employee was improperly forced to resign, claims or grievances based upon breach of the Master Contract Agreement, age discrimination claims, claims under state and federal civil rights laws, and claims under the Tenure Act. (Release & Waiver of Claims Agreement ¶ 3, Pl.'s Br. Supp. Mot. Ex. E.)

Plaintiffs were qualified for the ESP, and their applications were accepted by the District. Plaintiffs Appoloni and Engel retired in June 2001 and Plaintiff Bergemann retired in August 2001. Plaintiffs

began receiving their ESP payments upon retirement. The District withheld FICA taxes from Plaintiffs' ESP payments. Each Plaintiff filed a claim for refund of the employee's portion of the FICA taxes on the basis that the ESP payments are not wages but instead are payments in exchange for Plaintiffs' property rights. Plaintiffs filed this action after the IRS denied their claims for a refund.

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## III. Discussion

■ The sole issue presented in this case is whether the ESP payments Plaintiffs are receiving are wages for purposes of FICA. Plaintiffs contend that the ESP payments are not wages but instead constitute payment for Plaintiffs' surrender of

their tenure rights. Plaintiffs rely heavily upon the Eighth Circuit's decision in *North Dakota State University v. United States*, 255 F.3d 599 (8th Cir.2001). The Government contends that the ESP payments are wages subject to FICA tax because regardless of whether the payments are for a property right, the payments are for a right that arose out of the employment relationship. The Government contends that the Sixth Circuit's decision in *Gerbec v. United States*, 164 F.3d 1015 (6th Cir.1999), is controlling in this case. Both parties agree that Plaintiffs' right to tenure is a protected property right subject to due process protections. *See Tomiak v. Hamtramck Sch. Dist.*, 426 Mich. 678, 700, 397 N.W.2d 770, 780 (1986).[1]

FICA is a tax imposed upon the wages of employees to fund Social Security programs such as Old-age, Survivors, and Disability Insurance, as well as Medicare Insurance. 26 U.S.C. § 3101; *see Rowan Cos., Inc. v. United States*, 452 U.S. 247, 249 n. 2, 101 S.Ct. 2288, 2290 n. 2, 68 L.Ed.2d 814 (1981). The employer and the employee pay an equal portion of the tax. 26 U.S.C. §§ 3101, 3111. The employee's share of the tax is collected by the employer through deductions from the employee's wages. 26 U.S.C. § 3102. FICA defines "wages" as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash," subject to certain exemptions not relevant here. 26 U.S.C. § 3121(a). The term "employment" is defined as "any service, of whatever nature, performed ... by an employee for the person employing him." 26 U.S.C. § 3121(b).

1. Property interests protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution do not arise under the constitution but rather "are created and defined by independent sources, such as state law." *Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir.2002).

The Supreme Court interprets the phrase "remuneration for employment" broadly. *Soc. Sec. Bd. v. Nierotko,* 327 U.S. 358, 365, 66 S.Ct. 637, 641, 90 L.Ed. 718 (1946); *see also Gerbec v. United States,* 164 F.3d 1015, 1026 (6th Cir.1999) (stating that "[t]he phrase 'remuneration for employment' as it appears in § 3121 should be interpreted broadly"). Similarly, Treasury Regulations define "wages" broadly. Regardless of the name given to the payment, any remuneration for employment constitutes "wages." 26 C.F.R. § 31.3121(a)–1(c). Also, "the basis upon which the remuneration is paid is immaterial in determining whether the remuneration constitutes wages." 26 C.F.R. § 31.3121(a)–1(d). However, the Supreme Court has said that while all wages under FICA are "income" for purposes of income-tax withholding, the converse is not true, because "'wages' is a narrower concept than 'income.'" *Rowan Cos.,* 452 U.S. at 254, 101 S.Ct. at 2293 (citing *Cent. Ill. Pub. Serv. Co. v. United States,* 435 U.S. 21, 25, 98 S.Ct. 917, 919, 55 L.Ed.2d 82 (1978)). Thus, "'[w]ages usually are income, but many items qualify as income and yet clearly are not wages.'" *Rowan Cos.,* 452 U.S. at 254, 101 S.Ct. at 2293 (quoting *Cent. Ill. Pub. Service Co.,* 435 U.S. at 25, 98 S.Ct. at 919).[2]

The Sixth Circuit addressed the issue of wages for purposes of FICA in *Gerbec v. United States,* 164 F.3d 1015 (6th Cir. 1999). There, the plaintiffs were part of a class of employees who received settlement payments in a class action against their former employer. The plaintiffs in the class action alleged that their employer violated Section 510 of the Employment Retirement Income Security Act of 1974 by discharging a large number of workers shortly before they were eligible to vest in the employer's pension and health plans. The funds were distributed to class members based upon a Basic Award component, which was designed to compensate for the loss of dignity resulting from the alleged discrimination based upon age and years of service, and an Earnings Impairment Additur component, which was designed to compensate for loss in earnings capacity and to approximate long-term loss in employment prospects. The issues before the court in *Gerbec* were whether the plaintiffs' settlement awards were exempt from federal income tax under 26 U.S.C. § 104(a)(2), which at that time excluded amounts of damages "'received ... on account of personal injuries or sickness,'" *id.* at 1018 (quoting 26 U.S.C. § 104(a)(2)), and whether their settlement awards were subject to FICA tax. With regard to the

**2.** Plaintiffs argued in their brief in opposition to the Government's motion and again at oral argument that the *Central Illinois* case, and not *Nierotko,* is the governing authority on what constitutes wages for employment tax purposes. Plaintiffs further argue that in *Central Illinois* the Court refused to extend *Nierotko's* rationale for breadth of coverage from the social security benefits area to the employment tax area. The Court disagrees with Plaintiffs' assessment of *Central Illinois.* The issue in *Central Illinois* was whether an employer was required to withhold federal income tax on payments it made to its employees for reimbursement of lunch expenses. The Court held that the employer was not required to do so because there was no regu-

lation requiring withholding on such payments and prior cases had maintained the distinction between "wages" and "income." *Central Ill.,* 435 U.S. at 30–32, 98 S.Ct. at 922–23. Essentially, the Court refused to equate "wages" with "income" for purposes of income tax withholding because "wages" is a narrower concept than "income." The Court did not, as Plaintiffs suggest, reject *Nierotko's* observation that the definition of "wages," "employment," and "any service" are worded so as to "import breadth of coverage" with regard to the determination of whether payments made in the employment context are subject to employment tax. *Nierotko,* 327 U.S. at 365, 66 S.Ct. at 641.

income tax issue, the court held that the compensatory damages aspect of the settlement agreement fell within the exclusion under § 104(a)(2) but that non-tort amounts for back pay and future lost wages would be subject to taxation. *Id.* at 1023–25. With regard to the FICA issue, the court held that amounts for back pay and future lost wages were wages subject to FICA taxation. *Id.* at 1026. The court reached this conclusion even though the plaintiffs did not actually perform services for the payments they received. Noting that "[t]he phrase 'remuneration for employment' as it appears in § 3121 should be interpreted broadly," the court concluded that "'remuneration for employment' includes certain compensation in the employer-employee relationship for which no actual services were performed." *Id.* at 1026 (footnote omitted). As support for its conclusion, the court cited *Social Security Board v. Nierotko,* 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946), in which the Supreme Court held that an award of back pay qualified as wages under the Social Security Act of 1935 for purposes of crediting the worker's Old Age and Survivor's Insurance account. The Supreme Court reasoned that "service" as used in the Social Security Act "means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." *Nierotko,* 327 U.S. at 365–66, 66 S.Ct. at 637. Based upon *Nierotko,* the *Gerbec* court concluded "that awards representing a loss in wages, both back wages and future wages, that otherwise would have been paid, reflect compensation paid to the employee because of the employer-employee relationship, regardless of whether the employee actually worked during the time period in question." *Gerbec,* 164 F.3d at 1026. The court noted that those amounts would have been subject to FICA taxation if the plaintiffs had actually worked for the

employer during the periods covered by the back pay and future wage loss components of the award. *Id.*

In *North Dakota State University v. United States,* 255 F.3d 599 (8th Cir.2001) ("*NDSU*"), the Eighth Circuit held in a case of first impression at the appellate level that payments made to tenured faculty members in exchange for their tenure rights were not wages subject to FICA taxation. The court reasoned that the payments were for relinquishment of contractual and constitutionally-protected rights and not as remuneration for services to the university. The tenure system in that case provided that tenure could be granted to a faculty member after successful completion of a six-year probationary period. In certain cases tenure could be granted earlier or even perhaps upon an employee's hire. However, tenure was not automatic and required the employee to demonstrate a certain level of academic achievement, such as scholarship in teaching, contribution to a discipline or profession through research, other scholarly or professional activities, and service to the university and society. *Id.* at 601. The court pointed out that in contrast to seniority rights, which are attained solely through completion of service, a professor could receive tenure only by demonstrating qualities that merited tenure. *Id.* at 605. The court summed up its analysis as follows:

> Under the terms of the Early Retirement Program, the tenured faculty received a negotiated amount of money in exchange for giving up their constitutional and contractual rights to tenure. In other words, they relinquished their tenure rights. They did not receive what they were entitled to under their contracts, which was continued employment absent fiscal constraints or adequate cause for termination. Rather

they gave up those rights ... in exchange for the relinquishment of their contractual and constitutionally-protected tenure rights rather than as remuneration for services to NDSU.

*Id.* at 607.

As part of its analysis in *NDSU*, the court considered three Revenue Rulings addressing whether lump-sum payments to employees constituted wages subject to taxation under FICA or other similar enactments.[3] In Revenue Ruling 58–301, the taxpayer was employed under a written contract with a five-year term. In the second year of the contract, the taxpayer and his employer agreed to cancel the remaining term of the contract, and the taxpayer agreed to accept a lump-sum payment as consideration for the cancellation of his contract rights. The majority of the ruling was devoted to the issue of whether the payment constituted a capital gain or was ordinary income. After concluding that the payment was ordinary income, the IRS concluded in one sentence, without explanation, that the lump sum payment was not subject to FICA tax. *See Revenue Ruling*, Rev. Rul. 58–301, 1958–1 C.B. 23, 1958 WL 10630 (1958). In Revenue Ruling 74–252, the employee had a three-year employment contract which permitted the employer to terminate the employment relationship at any time provided the employer paid the employee an amount equal to six months salary. The employer terminated the contract and began making payments. Citing regulations pertaining to income tax withholding, the IRS concluded that the payment was wages under both FICA and the Federal Unemployment Tax Act. The IRS distinguished the payments from the lump-sum payment in Revenue Ruling 58–301 on the basis that the instant payments were made by the employer upon the employee's involuntary separation and were in the nature of dismissal payments, whereas the payment in Revenue Ruling 58–301 was made as consideration for the employee's relinquishment of his interest in his employment contract—an interest in the nature of property. *See* Rev. Rul. 74–252, 1974–1 C.B. 287, 1974 WL 34867 (1974). Finally, in Revenue Ruling 75–44, a railroad employee had acquired rights to security in his employment and to additional pay or other recognition for longevity based upon his past service under a general contract of employment with the railroad. The employee entered into an agreement with his employer to perform a different type of work and to refrain from asserting the employment rights he had previously acquired in exchange for a lump sum payment from the employer. The IRS determined that the lump sum payment was wages for purposes of income tax withholding because the employee had acquired his relinquished employment rights through his prior performance of services to the employer. The IRS also distinguished the payment from the payment in Revenue Ruling 58–301, noting that the present case did not involve the cancellation of an employment contract which, from the outset, bound the parties to a specified period of time. *See* Rev. Rul. 75–44, 1975–1 C.B. 15, 1975 WL 34658

---

3. The Sixth Circuit has held that a revenue ruling is not entitled to the same degree of deference accorded a statute or a Treasury Regulation but that some deference is appropriate depending upon " 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " *Aeroquip–Vickers, Inc. v. Comm'r*, 347 F.3d 173, 181 (6th Cir.2003) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228, 121 S.Ct. 2164, 2172, 150 L.Ed.2d 292 (2001)) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)).

(1975). The *NDSU* court determined that the facts in that case were most analogous to those in Revenue Ruling 58–301 because the faculty members received the payments in exchange for relinquishing their contractual and constitutionally-protected tenure rights. *NDSU*, 255 F.3d at 607.

*NDSU* appears to be the lone authority regarding the specific issue of whether a payment received in exchange for tenure rights constitutes wages. However, one court, finding *NDSU* factually indistinguishable with regard to the type of payment at issue, has declined to follow *NDSU. See CSX Corp. v. United States,* 52 Fed. Cl. 208 (2002). In *CSX,* the plaintiff railroads made substantial organizational changes to effectuate major reductions in force which resulted in a reduction of approximately twenty thousand railroad employees. The plaintiffs accomplished the reductions in force through several means, including permanent separations of some employees. All affected employees received some form of payment, and employees who ended their employment received monthly or lump sum payments. The plaintiffs paid the employer's share of FICA and other employment taxes and withheld and remitted the employees' shares of those taxes and subsequently filed claims for refunds. The majority of the court's opinion in *CSX* was devoted to the plaintiffs' primary argument, not relevant here, that the payments were "supplemental unemployment compensation benefits" and therefore were not wages subject to FICA. After concluding that most of the payments did not qualify as supplemental unemployment compensation benefits, the court turned to the plaintiffs' last argument, which was that the separation payments did not constitute wages because they did not represent compensation for services. The plaintiffs argued that, among other things, the separation payments were not wages because the pay-

ments constituted a buy-out of the plaintiffs' contractual employment rights. The court found that the plaintiffs' arguments construed the definition of wages too narrowly. *Id.* at 220. The court observed that the value of the benefits the plaintiffs held in their positions, including rights to vacation pay, sick pay, layoff pay, and seniority, were part of the plaintiffs' entire employment package and therefore were wages. *Id.* at 221. Thus, the court found that the plaintiffs' exchange of those rights for a lump sum payment "simply amount[ed] to a redemption, paid in cash, of wage amounts previously paid in kind. Because a separation payment is simply an exchange of equivalent values, what were wages at the start remain wages at the end." *Id.* The court declined to apply *NDSU,* even though it found no basis to distinguish between the tenure rights at issue in *NDSU* and the contract rights in the case before it—in both cases the employees surrendered "enforceable rights to future earnings in return for a present sum." *Id.* The court concluded that such payments must be considered wages because the rights surrendered were "part and parcel of the job protections and job benefits to which the employee may lay claim in return for his or her labor." *Id.*

 Based upon the foregoing discussion, the Court determines the issue of whether the ESP payments were wages by answering the following questions: (1) Did Plaintiffs receive the payments because of their employment relationship with the District?; and (2) Were Plaintiffs' tenure rights a benefit Plaintiffs earned through prior service to the District? The answer to the first question is yes. Even though Plaintiffs did not actually perform any services for the District in exchange for the payments, *Nierotko* and *Gerbec* both teach that a payment may be "remuneration for employment" even where no actual ser-

vices were performed. The purpose of the ESP was to provide the District a mechanism for controlling its fiscal outlay for staffing by encouraging a group of teachers with high seniority and at the top of the pay scale to terminate their employment relationship with the District. In exchange for the payments, Plaintiffs gave up their rights to continued employment with the District, as well as any other incidental benefits arising out of their employment relationship with the District. As in *Gerbec*, the payments to Plaintiffs represent at least part of the compensation Plaintiffs would have otherwise received had they continued to work for the District. *See Greenwald v. United States*, No. 98 Civ. 3439(DC), 2000 WL 16939, at *4, 2000 U.S. Dist. LEXIS 102, at *10 (S.D.N.Y. Jan. 6, 2000) (finding that a lump sum payment in exchange for the employee's relinquishment of future salary and bonus was a "substitute for future 'wages'"). Further support for this conclusion is found in the releases that Plaintiffs were required to sign in order to participate in the program. The releases covered a broad spectrum of potential claims arising out of the employment context. As Plaintiffs note, there is no evidence that Plaintiffs had any claims to release other than claims for payment for their tenure rights. However, the absence of other claims covered by the release does not undermine the conclusion that the payments were made to compensate for the employer-employee relationship. *See Abrahamsen v. United States*, 228 F.3d 1360, 1364–65 (Fed.Cir.2000). "Because the rights ... surrendered [were] integral to the employment relationship—they are part and parcel of the job protections and job benefits to which the employee may claim in return for his or her labor-they must be considered wages." *CSX Corp.*, 52 Fed. Cl. at 221.

With regard to the second question, whether Plaintiffs acquired their tenure rights as a result of past service for the District, the answer is also yes. The rights Plaintiffs possessed under the Tenure Act essentially boil down to the right to continued just cause employment, albeit in this case a right subject to due process protections. Plaintiffs acquired this right through performance of services for the District for the specified probationary period. After the successful completion of the probationary period, Plaintiffs received their statutory right to continued just cause employment. The circumstances in this case are thus more akin to those in Revenue Ruling 75–44 than to those in Revenue Ruling 58–301, because Plaintiffs acquired their rights through past performance of services, as in the former case, rather than at the beginning of the employment relationship, as in the latter case. "A payment arising from services rendered in the past clearly constitutes 'wages.'" *Greenwald*, 2000 WL 16939, at *4, 2000 U.S. Dist. LEXIS 102, at *11 (citing *Nierotko*). Therefore, the Court concludes that the ESP payments Plaintiffs received in exchange for their tenure rights were wages subject to FICA taxation.

Plaintiffs argue that tenure is much more than recognition for past services, as was the case in *NDSU*. Plaintiffs point out that in order to obtain tenure, a teacher must not only meet all of the requirements imposed by the State of Michigan, but must also meet any standards or requirements imposed by the local school board. One example Plaintiffs cite is the requirement that they maintain their teaching certificates, including the continuing education requirement. Plaintiffs also contend that the purposes of tenure under the Tenure Act, "to maintain an adequate and competent teaching staff, free from political and personal interference and to pro-

tect teachers from arbitrary and capricious employment practices of school boards," *Tomiak,* 426 Mich. at 686–87, 397 N.W.2d at 774 (citations omitted), are almost identical to the purposes of the tenure at issue in *NDSU.* While all of that may be true, the fact remains that under the Tenure Act, successful completion of the probationary period, i.e., past service, is an important, if not the primary, requirement for obtaining tenure.[4] In fact, in contrast to the tenure requirements in *NDSU,* the grant of tenure in this case is complete and automatic upon a teacher's successful completion of the probation; there is no separate application process. *See* M.C.L. § 38.83 (providing that the controlling school board's failure to provide the probationary teacher with a written statement regarding whether the teacher's work is satisfactory "shall be considered as conclusive evidence that the teacher's work is satisfactory"). Thus, regardless of whatever requirements may be imposed upon teachers after they receive tenure, the granting of tenure remains tied exclusively to the employee's performance of past satisfactory services. The Court finds *NDSU* distinguishable from the instant case, and to the extent that it is not, the Court declines to follow *NDSU.*

Plaintiffs also make much of the fact that their tenure rights are property rights. Yet, they fail to cite any basis for treating their payments differently from payments made for mere seniority rights not subject to due process protections with regard to the issue of FICA tax. While Plaintiffs' tenure rights had value to Plaintiffs, they had value only to the extent that Plaintiff continued to exercise them in the context of their employment relationship with the District. In this regard, a purchase of Plaintiffs' tenure rights cannot be distinguished from the purchase of other similar rights, such as seniority rights, at least with regard to the issue of whether the payment for such rights constitutes wages.

### IV. *Conclusion*

For the foregoing reasons, the Court concludes that the payments Plaintiffs received in exchange for their tenure rights are wages subject to FICA taxation. Accordingly, the Court will grant the Government's motion for summary judgment and deny Plaintiffs' motion for summary judgment.

An Order consistent with this Opinion will be entered.

---

4. At oral argument Plaintiffs' counsel stressed that tenure rights are granted by the State of Michigan rather than by the individual school district. Even so, the fact remains that tenure rights are granted in significant part *because of* the employee's past service to the employer.