Phyllis F. **KLENDER**, William B. **Rase**, Roger J. **Petri**, and all similarly-situated individuals, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

No. 02–10082–BC.

United States District Court, E.D. Michigan, Northern Division.

Aug. 2, 2004.

James D. Ponscheck, Jeffrey L. Nyquist, Michigan Education Association, East Lansing, MI, Suzanne K. Clark, Amberg, Firestone, Southfield, MI, for Plaintiffs.

Thomas P. Cole, Department of Justice, Tax Division, Washington, DC, for Defendant.

*OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT*

LAWSON, District Judge.

This case presents the issue of whether installment payments toward a fixed sum

made to school teachers by their school districts as an inducement to relinquish their tenure rights and retire early constitute "wages" from which deductions must be made under the Federal Insurance and Contribution Act (FICA), 26 U.S.C. § 3101, *et seq.* Although this issue has not yet been addressed by the Sixth Circuit, a similar case decided by the Eighth Circuit answered that question in the negative. *See North Dakota State Univ. v. United States*, 255 F.3d 599 (8th Cir.2001). The government urges this Court not to follow *North Dakota* because the early retirement program that benefited the tenured university professors in that case is materially different from those presented here, and because, in the government's view, *North Dakota* was wrongly decided. The Court believes, however, that a critical reading of the statutory language, as interpreted by Revenue Rulings issued by the Department of Treasury and guided by Supreme Court and Sixth Circuit precedent, leads ineluctably to the conclusion reached by the Eighth Circuit.

## I.

The material facts of the case are not in dispute. The named plaintiffs are all public school teachers who had worked for several years in their respective school districts and achieved tenured status. It appears that long-term teachers command larger salaries then newer employees under the various districts' collective bargaining agreements as a result of longevity premiums. Consequently, over the last few years some school districts have offered severance plans designed to induce more senior teachers to separate from the district in exchange for a fixed sum payable in regular installments.

Participation in the programs was entirely voluntary. However, each of the severance plans, described in more detail below, required the teacher to relinquish his or her right to continued employment

as a tenured teacher under Michigan's Teacher Tenure Act, Mich. Comp. Laws § 38.71, *et seq.*, and some of the plans limited the rights of the teachers to seek re-employment with the district. All of the named plaintiffs availed themselves of the opportunity to participate, and after they severed their employment they began to receive their installment payments. The respective school districts withheld from each payment an amount for taxes under FICA. The teachers contended that the payments under the incentive programs did not constitute "wages" within the meaning of FICA, and they each sought a refund from the Internal Revenue Service (IRS). When the refunds were refused, this suit was commenced.

The plaintiffs moved to certify the action as a class action, and on June 18, 2003 the Court entered an order granting the plaintiffs' motion and certifying the class. Motions for reconsideration of the order then were filed by both parties. On November 4, 2003, this Court entered an order granting in part and denying in part the motions for reconsideration and amended the class certification order to define the following class:

all individuals a) formerly employed by public school districts, public colleges or universities or community colleges; b) residing in the Eastern District of Michigan; c) who received from the school district, public colleges or universities or community colleges, a payment in exchange for a property right or the right to continued employment absent just cause for termination, pursuant to an Early Retirement Incentive Plan; d) who applied to the Internal Revenue Service for a refund of the portion of said payment that was withheld as taxes and other payroll deductions as if from wages pursuant to the Federal Insurance Contribution Act within two years from the time the tax was paid; and e)

whose refund was refused by the Internal Revenue Service on or after March 27, 2000, or who filed a claim for a refund before September 27, 2001 that was not acted upon before March 27, 2002.

Order, Nov. 4, 2004, at 8. Prior to entry of that order, the plaintiffs filed an amended complaint on August 1, 2003 in which they amended their prayer for relief to include a request for attorney fees.

Plaintiffs Phyllis Klender and Roger Petri both were employed by the Pinconning Area School District, although they did not retire early under the same plan. Plaintiff William Rase was employed by the West Branch–Rose City Area School District. Since the government has suggested that differences between the incentive plans in this case and the one discussed by the Eighth Circuit in *North Dakota* might be material, the Court will review the salient features of the plans in which the respective named plaintiffs participated.

### A. Phyllis Klender

In 2000, the Pinconning Area Schools in Pinconning, Michigan created an "Employee Severance Plan" designed to induce long-term employees to leave their jobs. In the plan, the school district stated that it had "determined that a limited program of severance of employment among a specified group of employees would permit the District to control salary and operating costs and better fulfill its educational purposes." Pl.s' Mot. Summ J. Ex. C; Gov't Mot. Summ. J. Ex. 2. The plan was available to "teaching staff who have twenty (20) or more years of service with Pinconning Area Schools as of June 30, 2000." *Ibid.* The school district offered employees who chose to participate in the plan certain benefits that were categorized under two separate options. Under "Option 1," the employee had to separate from the school district on June 30, 2000 and would receive "$46,800 divided into 72 monthly payments

(six (6) years)." *Ibid.* Under "Option 2," the employee had to separate from the district on June 30, 2001 and would receive "$43,200 divided into 72 monthly payments (six (6) years)." *Ibid.*

In exchange for the payments, the employees agreed to give up the following rights:

In consideration of benefits to be received under the Plan, the employee shall waive (effective on the date of his/her separation from district service) all future employment rights, all entitlements to future wages and benefits increases, all rights to participate in any district-sponsored benefit plans (other than the right to payments under this Plan and the right to purchase continuation of heath, dental and vision benefits under COBRA) and shall agree not to apply for reemployment (unless such application is consented to by the district).

An employee who elects to participate in the Plan shall be required to execute the following documents which are results of the negotiated agreement between the District and the Pinconning Education Association:

Exhibit B—"Indication of Interest—Notice of Election Form"

Exhibit C—"Employee Severance Plan"

Exhibit D—"Release and Waiver of Claims Agreement"

Exhibit E—"Notice of Enrollment"

Exhibit F—"Tabulation of Eligibility and Non–Eligibility"

*Ibid.* The indication of interest form is a document wherein the employee agreed to resign from the school district by a certain date. The employee severance plan form is the document in which the employee elected option one or two under the plan. The notice of enrollment and tabulation of eligibility forms are documents providing

the applicant with general information about the plan. *See e.g.,* Pl.s' Ex. C; Gov't Ex. 4–6.

The "Release and Waiver of Claims Agreement" form constituted a broad release of claims against the district. The form provides, in pertinent part, that

[t]he signature of the Employee herein constitutes the release and waiver of any and all claims against the District, District representatives and the Pinconning Education Association/MEA/NEA including, but not limited to, any rights to reappointment in any subsequent fiscal school year, and to any and all claims existing in equity or law under federal and state law or board policy pertaining to any right to reappointment or tenure rights by virtue of any expressed agreements or oral understandings. Further, the Employee hereby waives any and all claims, causes of actions, grievances, or complaints against the District and District representatives relating to resignation of employment, relinquishment of any and all tenure rights and rights to reappointment.

Pl.'s Ex. C; Gov't Ex. 6. The form also states that the employee waives, among other things, his or her rights to bring suit under "Title VII of the U.S. Civil Rights Act of 1964 or any other statute, constitutional provision or common law theory related to employment, employment discrimination or his/her separation from employment" and under the "Age Discrimination in Employment Act of 1967 and the Older Workers Protection Act of 1990." *Ibid.*

In the fall of 1999, the Pinconning Area Schools offered plaintiff Phyllis Klender the opportunity to participate in the plan and retire early from her employment. Klender qualified for the plan having worked as a librarian for the Pinconning Area Schools since January 1968. Klender obtained tenure from the school district in 1971 after successfully completing her probationary period and receiving positive evaluations. On December 14, 1999, Klender signed the indication of interest form, elected "Option 1" on the employee severance plan form, and thus she agreed to retire early on June 30, 2000 in exchange for the sum of $46,800, payable in seventy-two monthly payments. She signed the "Release and Waiver of Claims Agreement" form on the same date.

The Pinconning Area Schools deducted FICA taxes from the payments Klender received under the severance plan. On December 27, 2001, Klender filed a claim for a refund, Form 843, with the IRS for FICA withheld on the payments she received under the severance plan. On January 23, 2002, the IRS denied Klender's claim for a refund.

### B. Roger Petri

The Pinconning Area Schools offered a similar severance plan in 1996 to plaintiff Roger Petri. The "Voluntary Teacher Severance Incentive Program" was available in 1996 to all teachers who had ten years of experience with the school district as of June 30, 1997. Under the 1996 program, an employee was guaranteed a payment of $2,000 for electing to participate in the program, but if ten or more eligible employees elected to participate in the program, then the program provided that "all such individuals shall receive $35,000.00 in addition to the $2,000.00 minimum benefit." Pl.'s Ex. E; Gov't Ex. 8. The payments would be made to participants over a period of up to three years.

Like the 2000 severance plan, the 1996 Pinconning severance program required that teachers relinquish their rights to continued employment. In exchange for the payments, teachers made the following agreement:

The Teacher acknowledges and agrees in consideration of the receipt of sever-

ance payments ... to fully and completely waive, discharge, release and hold Pinconning Area Schools and the Pinconning Area Education Association harmless ... from any and all liability, claims, charges, demands and/or causes of action of any kind whatsoever, known or unknown, based upon any fact or event occurring or existing prior to the execution of this Agreement, including, but not limited to, claims for breach of contract, deprivation of constitutional rights, claims of wrongful discharge and/or claims of discrimination ... and/or claims for personal injuries and/or damages ... arising during and from his/her employment and/or from his/her severance and retirement from Pinconning Area Schools pursuant to the terms of the Program.

*Ibid.*

Roger Petri had worked as a teacher for the Pinconning Area Schools since October 1971 and therefore qualified for the severance program. He obtained tenure from the school district in 1973 by successfully completing his probationary period and successfully meeting the standards of teaching set forth by the board of education and the state of Michigan. He maintained his tenure after the first six years of teaching by receiving good evaluations from the district. In February 1997, Petri notified the school district of his intent to retire early in June 1997 and signed the necessary paperwork, including the release document. Apparently, the school district found at least nine other individuals willing to participate since Petri states that he received "approximately $37,500" to participate in the 1996 Pinconning severance program. *Ibid.* Although not specifically stated in the release document, Petri claims that he agreed to retire and relinquish his tenure rights in exchange for the school district paying him the $37,500. This amount was to be paid over a period of three years.

The Pinconning Area Schools deducted FICA taxes from the payments Petri received under the program. On August 29, 2001, Petri filed a claim for a refund, Form 843, with the IRS for FICA withheld on the payments he received from the school district. On October 23, 2001, the IRS denied Petri's claim for a refund.

## C. William Rase

Like the Pinconning Area Schools, the West Branch–Rose City Area School District devised a plan to give certain teachers a fixed sum in exchange for the teachers' agreement to retire early. The West Branch "Early Retirement" plan was incorporated into the "Master Agreement" between the school district and the West Branch–Rose City Education Association. *See* Pl's Ex. G; Gov't Ex. 11. Under the plan, any teacher with twenty years or more of service to the school district could receive between $10,000 and $30,000 if he or she retired early. The actual amount received depended on the number of years the teacher was involved in a Michigan public employees' retirement plan. There is no indication that the teachers who chose to participate in the early retirement plan had to agree to release certain rights to receive the benefit payment.

Plaintiff William Rase qualified for the early retirement plan because he had worked as a teacher for the school district since September 1979. Rase obtained tenure from the school district in 1981 by successfully completing his probationary period and meeting the standards of teaching set forth by the board of education and state of Michigan. He maintained his tenure after the first six years of teaching by receiving good evaluations from the district. In February 2001, Rase agreed to voluntarily retire in exchange for a $30,000 payment. Although not specifically stated in the "Early Retirement" plan, Rase claims that he agreed to retire and relin-

quish his tenure rights in exchange for the school district paying him the $30,000.

The West Branch–Rose City School District deducted FICA taxes from the payment Rase received under the plan. On October 16, 2001, Rase filed a claim for a refund, Form 843, with the IRS for FICA withheld on the payments he received under the plan. On December 6, 2001, the IRS denied his claim for a refund.

\*     \*     \*     \*     \*     \*

As mentioned, the parties filed cross motions for summary judgment on January 30, 2004. Both parties have filed answers in opposition to the respective motions and replies in support of their motions. The Court heard oral argument on May 19, 2004 and took the motions under advisement. This matter is ready for decision.

## II.

Both the plaintiffs and the defendant have moved for summary judgment; neither has argued that there are material facts in dispute. Rather, each party claims entitlement to a judgment in its favor as a matter of law. "By its very nature, a summary judgment does not involve the determination of disputed questions of fact, but is confined to purely legal issues." *Eisenmann Corp. v. Sheet Metal Workers Intern. Ass'n Local,* 323 F.3d 375, 380 (6th Cir.2003) (citing Fed.R.Civ.P. 56(c) (summary judgment may be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law") and *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records,* 329 F.3d 437, 444 (6th Cir.2003). Thus, when this Court evaluates cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.,* 336 F.3d 503, 506–07 (6th Cir.2003). When the record reviewed in its entirety could not lead a rational fact finder to find for the nonmoving party, the moving party is entitled to judgment as a matter of law. *U.S. Fire Ins. Co. v. Vanderbilt Univ.,* 267 F.3d 465, 470 (6th Cir.2001).

■■■ The plaintiffs contend that the government wrongfully denied their request for a refund of FICA taxes withheld because the installment payments they received under their buyout plans were not subject to the tax. They claim that the payments were made by the school district in exchange for property rights—that is, their rights as tenured teachers to continued employment absent just cause for termination—and therefore the payments were not for wages.

The Federal Insurance and Contributions Act, 26 U.S.C. § 3101, *et seq.,* "impose[s] on the income of every individual a tax [of 7.65 percent]" on all "wages" received "with respect to employment." 26 U.S.C. § 3101(a). The proceeds of this tax support programs under the Social Security Act. *See Rowan Cos. Inc. v. United States,* 452 U.S. 247, 250 n. 2, 101 S.Ct. 2288, 68 L.Ed.2d 814 (1981). The tax imposed by FICA "shall be collected by the employer of the taxpayer, by deducting the

amount of the tax from the wages as and when paid." 26 U.S.C. § 3102(a). The employer is also required to pay an equal amount itself as an employment tax, which is not at issue in this case. *See* 26 U.S.C. §§ 3102, 3111. Under FICA, "the term 'wages' means all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." 26 U.S.C. § 3121(a). "[T]he term 'employment' means any service, of whatever nature, performed ... by an employee for the person employing him." 26 U.S.C. § 3121(b).

The government argues that Sixth Circuit law commands that the phrase "remuneration for employment" "should be interpreted broadly" and must "include[ ] certain compensation in the employer-employee relationship for which no actual services were performed." *Gerbec v. United States,* 164 F.3d 1015, 1026 (6th Cir.1999). *See also Social Sec. Bd. v. Nierotko,* 327 U.S. 358, 365, 66 S.Ct. 637, 90 L.Ed. 718 (1946) (concluding that the phrase " 'any service ... performed ... for his employer' " under the Social Security Act "import[s] breadth of coverage"). However, the plaintiffs believe that *Gerbec* does not control here because the plaintiffs relinquished a tangible property interest in exchange for the payments. Rather, they say this Court should look for guidance to the Eighth Circuit decision, which, the plaintiffs suggest, deals with a materially indistinguishable claim for refunds that was sustained. *See North Dakota,* 255 F.3d at 603. There, the court stated that "[a]lthough wages and employment are read broadly in the FICA context, clearly not all payments by employers to employees constitute wages." *Ibid;* *see also Gerbec,* 164 F.3d at 1026. Indeed, the Supreme Court has opined that "[w]ages usually are income, but many items qualify as income and yet clearly are not wages." *Cent. Ill. Pub. Serv. Co. v.*

*United States,* 435 U.S. 21, 25, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978).

In *North Dakota,* North Dakota State University (NDSU) offered an early retirement program to certain tenured faculty and high-level administrators. Under the "Early Retirement Agreement" instituted by NDSU, "the employee agreed to give up any tenure, contract, and/or other employment rights, agreed not to seek employment with a North Dakota public university or college, and agreed to give up any claim against NDSU under the Age Discrimination in Employment Act" in exchange for a negotiated "buy out" payment, which was capped at 100% of the employee's most recent annual salary. *North Dakota,* 255 F.3d at 601. Tenure at NDSU was granted to faculty members upon recommendation by NDSU to the North Dakota Board of Higher Education (Board), which made the final tenure decision. NDSU had a tenure track of six years during which time faculty members were evaluated annually. Tenure could also be granted before six years. The Board considered various factors in making tenure decisions, including scholarship in teaching and service to the institution. Once tenure was granted, the professor had the right to "continuous academic year employment in the specific program area for which the tenure was granted." *Ibid.* A tenured faculty member could be terminated only based on specified "fiscal reasons" and for "adequate cause." *Ibid.* The tenure policies also required that specific due process rights and procedures be afforded a tenured faculty before any termination.

Prior to 1991, NDSU withheld FICA taxes from the payments to those employees who had chosen to participate in the early retirement program and also paid its share of FICA taxes. During 1991, some early retirement program participants

questioned NDSU's payroll department about the applicability of FICA to the payments, prompting NDSU officials to contact the Social Security Administration (SSA) about the applicability of the tax. The SSA responded with a letter stating that the "payment to secure the release of an unexpired contract of employment" was not considered wages for Social Security purposes. As a result, NDSU stopped both withholding and paying FICA taxes on the early retirement program payments.

The IRS audited NDSU in 1995 and assessed deficiencies in FICA taxes for the years 1991 through 1994 with respect to the early retirement program payments. NDSU paid the assessment and filed for a refund with the IRS. Upon denial of the refund claim, NDSU filed a suit in federal court.

The district court determined that the retirement payments to NDSU administrators were wages subject to FICA because the administrators were "at will employees." However, the district court treated the tenured faculty members at NDSU differently because the faculty had a "recognized property interest in their tenure." *Id.* at 602. "The district court concluded that the payments to tenured faculty were made in exchange for the relinquishment of a property or contract interest rather than for compensation and as such were not subject to FICA taxation." *Ibid.*

In affirming the district court, the Eighth Circuit employed an analytical method wherein it reviewed different revenue rulings made by the Treasury Department dealing with a variety of advance or lump-sum payments made by employers to employees severing their employment relationship, and it adopted the one it found most analogous to the case at hand as the law of that circuit. The court thus looked to the Treasury Department's own determinations of whether FICA taxes were owed on severance payments made under a variety of circumstances. The first was *Revenue Ruling*, Rev. Rul. 58–301 (1958–1 C.B. 23, 1958 WL 10630 (IRS RRU 1958)), determining that FICA taxes were not payable on a lump-sum payment that terminated a five-year employment contract early. The employer and the employee agreed to cancel the contract in the second year, and the employer paid the employee a lump sum in exchange for the employee's relinquishment of his contract rights. The IRS held that payments in exchange for contract rights are not wages under FICA. The second determination considered by the court was *Dismissal Payment Made Under Terms of an Employment Contract*, 1974 WL 34867, Revenue Ruling 74–252 (IRS RRU 1974), where the IRS stated that payments to an employee to terminate his three-year employment contract were FICA wages. The contract gave the employer the right to terminate the contract at any time upon payment of the sum, and the IRS reasoned therefore that the payment was made pursuant to the employment contract, thereby distinguishing Revenue Ruling 58–301. The third determination, *Lump-Sum Payment; Employment Seniority Rights relinquished*, 1975 WL 34658, Revenue Ruling 75–44 (IRS RRU 1975), concerned the applicability of the Railroad Retirement Tax Act (RRTA) (FICA's counterpart for railroad employees) to a lump-sum payment given to a railroad employee to buy out his seniority rights he had earned under a general employment contract. The employee enjoyed no more than at-will status, but his prior service had earned him longevity pay premiums. The IRS concluded that payment for those seniority rights constituted remuneration for past service earned and therefore the payments were wages subject to the tax.

The court noted that unlike tenured professors, the university administrators could

be terminated without cause subject only to an advance notice requirement, and therefore the severance payments made to them did not purchase any contract or property rights. *Id.* at 608. The court viewed that distinction as critical. The university professors, on the other hand, had achieved tenure that granted them lifetime appointments subject only to well-defined grounds for removal. Their tenure was a valuable right representing more than recognition for past service or performance; it was a right that had economic value to the employee, established at the outset of the tenure relationship, and protected under state law. *Id.* at 606. The court held, therefore, that payments in exchange for relinquishing tenure rights under a contract are not wages for FICA purposes.

> Under the terms of the Early Retirement Program, the tenured faculty received a negotiated amount of money in exchange for giving up their constitutional and contractual rights to tenure. In other words, they relinquished their tenure rights. They did not receive what they were entitled to under their contracts, which was continued employment absent fiscal constraints or adequate cause for termination. Rather they gave up those rights, making this case more analogous to Revenue Ruling 58–301 than to Revenue Ruling 74–252. We hold that payments made to tenured faculty under NDSU's Early Retirement Program were made in exchange for the relinquishment of their contractual and constitutionally-protected tenure rights rather than as remuneration for services to NDSU. Thus, the payments are not subject to FICA taxation.

*Id.* at 607.

The government argues that the tenure rights relinquished by the plaintiffs in this case are different than those in *North Dakota* because here there are no considerations of academic freedom and the tenure track for NDSU professors was more rigorous than that involved in this case. Moreover, the government contends that Sixth Circuit precedent requires a different result and points to *Gerbec v. United States, supra* in support. In that case, the Continental Can Company (Continental) "laid-off" 7,000 employees before they were eligible to vest in Continental's health and pension benefits plan. As a result, two separate classes of plaintiffs brought actions against Continental under Section 510 of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1140, claiming that they were wrongfully discharged as part of Continental's illegal scheme to avoid paying pension benefits. Continental eventually settled the class action suits for a sum total of $415 million. The settlement was distributed and the named plaintiffs, former Continental employees, received substantial pre-tax awards. They paid federal income and FICA taxes on the award, sought a refund that was denied, and then filed an action in federal court seeking reimbursement of the federal income tax and FICA taxes paid. Regarding the FICA taxes, the plaintiffs argued that the settlement proceeds were not "wages" or "remuneration for employment" subject to the tax. The district court granted the plaintiffs' motion for summary judgment in part finding that their award should not have been subject to the FICA tax.

On appeal, the government argued that because the settlement awards were based on an individual's age and seniority with the company, the awards were remuneration for employment and thus "wages" subject to FICA taxation. The court held that certain payments the employer made to compensate its employees for non-physical personal injuries resulting from the deprivation of civil rights were not subject to taxation. However, proceeds representing compensation for past or future wages

fell within FICA's definition of "wages." *Gerbec,* 164 F.3d at 1025. In reversing that aspect of the district court's decision, the Sixth Circuit examined the Supreme Court's holding in *Social Security Board v. Nierotko,* 327 U.S. at 365, 66 S.Ct. 637. The court found that

> [t]he holding in *Nierotko* clearly supports the conclusion that awards representing a loss in wages, both back wages and future wages, that otherwise would have been paid, reflect compensation paid to the employee because of the employer-employee relationship, regardless of whether the employee actually worked during the time period in question.

*Gerbec,* 164 F.3d at 1026. The court then concluded by stating the following:

> Had Plaintiffs in this case actually worked for Continental during the periods for which they sought back wages and future wages lost as a result of the firing, the wages indisputably would have been subject to FICA taxation. We conclude that it would be improper to exempt Plaintiffs from mandatory FICA taxes merely because they were not employees of Continental at the time the payments were made and because the payments were not in return for actual services performed. *Cf.* 26 C.F.R. § 31.3121(a)-(1)(i) ("[r]emuneration for employment ... constitutes wages even though at the time paid the relationship of the employer and employee no longer exists between the person in whose employ the services were performed and the individual who performed them"). Therefore, any damages attributable to wages they would have received had they not been wrongly terminated should also be subject to the FICA taxes they would have paid on those wages had they not been wrongly terminated. Any other result would run contrary to the purpose of the FICA system.

*Id.* at 1026–27.

It is the language quoted above that the government contends is the law of the Circuit that controls the decision in this case.

The government also contends that the *North Dakota* court was incorrect when it concluded that payments that arose from the employment relationship should not be considered as wages. It urges this Court to follow the reasoning of the Court of Federal Claims in *CSX Corp. v. United States,* 52 Fed. Cl. 208 (2002), which rejected the holding in *North Dakota.* In that case, the plaintiff, a railroad company, was forced to implement major reductions in its work force between 1984 and 1990. As part of its work force reduction, the plaintiff made bi-weekly, monthly, and lump-sum payments to various employees for ending their employment as required by certain regulatory rulings and collective bargaining agreements. The plaintiff paid its share of the FICA tax and the RRTA tax and withheld and remitted the employee's share of those amounts on the lump-sum payments. However, the plaintiff later filed for a refund of the FICA and RRTA taxes claiming that the payments in question were "supplemental employment compensation benefits" not subject to the employment taxes. After the IRS denied the refund claim, the plaintiff filed suit in the Court of Federal Claims seeking a determination that the reduction-in-force payments constitute neither wages nor compensation for purposes of imposing federal employment tax. In rejecting the plaintiff's assertion that the payments were not subject to FICA, the court held the following:

> We think plaintiffs are applying the definition of wages too narrowly. As has been repeated several times in this opin-

ion, the term "wages" is defined as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." 26 U.S.C. § 3121(a). Pursuant to this definition then, the value of the benefits and protections that each employee held in his or her position—rights to vacation pay, sick pay, layoff pay, and seniority—constituted part of the employee's total compensation package and, hence, constituted wages. Therefore, when these job-related benefits are relinquished in favor of a lump-sum payment, the transaction simply amounts to a redemption, paid in cash, of wage amounts previously paid in kind. Because a separation payment is simply an exchange of equivalent values, what were wages at the start remain wages at the end.

Plaintiffs insist, however, that payments received in exchange for the release of employment rights are not wages subject to employment taxes. In support of this position, plaintiffs rely on *North Dakota State Univ. v. United States*, 255 F.3d 599 (8th Cir.2001), a case holding that severance payments made to tenured faculty members in exchange for their early retirement did not constitute remuneration for services and, hence, did not constitute wages. The basis for this holding was the court's conclusion that the relinquishment of tenure represented the relinquishment of rights to "continued employment absent fiscal constraints or adequate cause for termination." *Id.* at 607. Plaintiffs now draw on this same reasoning, saying that the job protection and seniority rights relinquished here are, like tenure, rights to continued employment. Hence, they argue, the separation payments received in exchange for the relinquishment of these rights are not wages.

Although this court is not bound by a decision of the Eighth Circuit, it recog-nizes that, as a trial court, it should endeavor to follow the teaching of higher authority whenever it can reasonably do so. In this instance, however, such adherence is not possible—at least not without reversing course on what we have thus far decided. This court can see no basis upon which to distinguish between the tenure rights considered in *North Dakota* and the contract rights at issue here. In each case, the surrender of these rights in return for a cash payment represents the surrender of enforceable rights to future earnings in return for a present sum. Because the rights being surrendered are integral to the employment relationship—they are part and parcel of the job protections and job benefits to which the employee may lay claim in return for his or her labor—they must be considered wages. And whether accrued over the term of the employment relationship or redeemed at present value, these rights represent remuneration for services and, hence, are wages.

*CSX Corp.*, 52 Fed. Cl. at 220–221.

Perhaps the simplest course under Sixth Circuit precedent would be to hold that any payments arising from the employer-employee relationship constitutes "wages" under 26 U.S.C. § 3101. However, that rule would contradict the Supreme Court's holding in *Illinois Central States* that payments made by an employer to its employees to reimburse them for work-related lunch expenses were not subject to FICA. 435 U.S. at 25, 98 S.Ct. 917. The government conceded at oral argument that this case stood in the way of a blanket rule requiring all payments made by the employer to an employee to be deemed wages under FICA. Moreover, the rule articulated in *Gerbec* was not nearly as absolute as the government contends. The court there said that the statutory definition of wages found in FICA "includes *certain*

compensation in the employer-employee relationship for which no actual services were performed." *Gerbec*, 164 F.3d at 1026 (emphasis added). An alternate rule would be to apply FICA only to those payments made by an employer to employees in exchange for actual work or services, but that approach runs afoul of Sixth Circuit precedent. Furthermore, the payments in this case were not for services, past, present or future. Rather, they were made in exchange for the employees' relinquishment of the right to exchange services for wages in the future. They were not payments for work; they were payments not to work.

Nor does the Court agree with the reasoning of *CSX Corp.* that the surrender of contract rights to work in exchange for cash must be considered as wages under FICA. That ruling does not account for the fact acknowledged by the Sixth Circuit in *Gerbec* that compensation by an employer for the deprivation of certain rights constitutes neither income nor wages for federal tax purposes, including FICA, *see Gerbec*, 164 F.3d at 1025, and ignores the Treasury Department's Revenue Ruling 58–301 determining that consideration for an employer's purchase of contract rights from an employee is not "wages" subject to FICA. The Sixth Circuit has held that revenue rulings by the Treasury Department, although not carrying the force of agency regulations under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), nonetheless are entitled to "substantial deference." *Aeroquip-Vickers, Inc. v. C.I.R.*, 347 F.3d 173, 180–81 (6th Cir.2003) (citing *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001)) (holding that "[i]n the context of tax cases, the IRS's reasonable interpretations of its own regulations and procedures are entitled to particular deference"). That is because "[r]evenue rulings ...

serve as 'official interpretation[s]' by the IRS of the tax laws." *Id.* at 181.

The Court believes that the principled method of distinguishing "wages" from other employer payments articulated by the Treasury Department in its revenue rulings, fully discussed by the *North Dakota* court, is to focus on the purpose of the payments. Payments for past or future service, or in recognition of past performance, are wages subject to the tax. Payments for other purposes are not. Or in the words of the *Gerbec* court, payments "attributable to wages [workers] would have received had they not been wrongly terminated should also be subject to the FICA taxes" irrespective of whether the worker was still employed at the time the payment was made. *Gerbec*, 164 F.3d at 1027. Compensation for the deprivation of other rights are not subject to taxation. *Id.* at 1025.

The government argues that the payments made by the school districts to the plaintiffs in exchange for relinquishing tenure rights in reality are payments in lieu of future wages, and therefore are more analogous to the compensation paid to the employee in Revenue Ruling 74–252 or the railroad worker in Revenue Ruling 75–44. In those cases, however, the employees were employed either at will or subject to a contractual provision that fixed a sum for early termination; there was no contractual or statutory right to continued employment. In contrast, an examination of tenure under Michigan law discloses direct parallels to the nature of the tenure discussed in *North Dakota*.

■ Courts in Michigan consider tenure for public school teachers to be a property right. *See Tomiak v. Hamtramck School District*, 426 Mich. 678, 700, 397 N.W.2d 770, 779–80 (1986) (stating that"[a]lthough ... the teacher tenure act does not require a full evidentiary hearing before re-

moving an abandoning teacher's name from the recall list, there remains consideration of plaintiff's constitutional right to due process of law. Because continued employment *is a protected property interest*, a termination of that interest requires conformity to the requirements of due process under the Fourteenth Amendment and Const.1963, art. 1, § 17.") (emphasis added); *Detroit Bd. of Educ. v. Parks*, 98 Mich.App. 22, 42, 296 N.W.2d 815, 825 (1980) (holding that tenured teachers in Michigan have a protected property interest in their employment which entitles teachers to notice and an opportunity to be heard prior to being discharge for failure to pay agency shop fees). A similar analogy has been drawn to civil service employees and their property interests in employment. *See State Employees Ass'n v. Department of Mental Health*, 421 Mich. 152, 160–161, 365 N.W.2d 93, 97 (1984) ("The guarantee of job tenure absent just cause for dismissal under the Michigan civil service system creates a property right for public employees which the state may only take away in accordance with due process.") (citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

Tenure is itself a relationship between a teacher and her school district, but it arises by operation of state law. Under Michigan's Teacher Tenure Act, Mich. Comp. Laws § 38.71, *et. seq*, a teacher first hired by a school district is subject to "a probationary period during his or her first 4 full school years of employment." Mich. Comp. Laws § 38.81. "Teacher" is defined in the Act as "a certificated individual employed for a full school year by any board of education or controlling board." Mich. Comp. Laws § 38.71. "The term 'certificated' means holding a valid teaching certificate, as defined by the state board of education." Mich. Comp. Laws § 38.72. At least sixty days before the close of each school year the controlling board, which is

defined in the Act as any board "having the care, management, or control over public school districts and public educational institutions," Mich. Comp. Laws § 38.73, is required to provide the probationary teacher with a "definite written statement as to whether or not his work has been satisfactory." Mich. Comp. Laws § 38.83. Failure to submit a written statement is considered in the Act as conclusive evidence that the teacher's work is satisfactory. *Ibid.* The Act also provides that "[a]ny probationary teacher or teacher not on continuing contract shall be employed for the ensuing year unless notified in writing at least 60 days before the close of the school year that his services will be discontinued." *Ibid.* Finally, the Act provides that the "controlling board of the probationary teacher's employing school district shall ensure that the teacher is provided with an individualized development plan developed by appropriate administrative personnel in consultation with the individual teacher and that the teacher is provided with at least an annual year-end performance evaluation each year during the teacher's probationary period." Mich. Comp. Laws § 38.83a. Failure of a school district to provide a probationary teacher with a development plan or a performance evaluation "is conclusive evidence that the teacher's performance for that school year was satisfactory." *Ibid.*

After the satisfactory completion of the probationary period, the Act states that "a teacher shall be employed continuously by the controlling board under which the probationary period has been completed, and shall not be dismissed or demoted except as specified" in the Act. Mich. Comp. Laws § 38.91. The Act requires that the

controlling board of the school district employing a teacher on continuing tenure shall ensure that the teacher is provided with a performance evaluation at least once every 3 years and, if the

teacher has received a less than satisfactory performance evaluation, the school district shall provide the teacher with an individualized development plan developed by appropriate administrative personnel in consultation with the individual teacher.

Mich. Comp. Laws § 38.93(1). Failure of a school district to comply with Section 38.93(1) "is conclusive evidence that the teacher's performance for that period was satisfactory." Mich. Comp. Laws § 38.93(2).

The Act allows for "discharge" or "demotion" of a teacher on continuing tenure, but "only for reasonable and just cause." Mich. Comp. Laws § 38.101. Demotion is defined in the Act as a "means to reduce compensation for a particular school year by more than an amount equivalent to 3 days' compensation or to transfer to a position carrying a lower salary." Mich. Comp. Laws § 38.74. The Act states that "all charges against a teacher shall be made in writing" and "a copy of the charges shall be provided to the teacher." Mich. Comp. Laws § 38.102.

The charges shall specify a proposed outcome of either discharge or a specific demotion of the teacher. The controlling board shall decide whether or not to proceed upon the charges, or may modify the charges and decide to proceed upon the charges as modified, not later than 10 days after the charges are filed with the controlling board. A decision to proceed upon the charges shall not be made except by a majority vote of the controlling board and shall be reduced to writing. The controlling board, if it decides to proceed upon the charges, shall furnish the teacher not later than 5 days after deciding to proceed upon the charges with the written decision to proceed upon the charges, a written statement of the charges and a statement of the teacher's rights under this article.

*Ibid.* The Act also provides that the a "teacher on continuing tenure may contest the controlling board's decision to proceed upon the charges against the teacher by filing a claim of appeal with the tenure commission and serving a copy of the claim of appeal on the controlling board." Mich. Comp. Laws § 38.104.

The rights granted by statute are the rights the plaintiffs relinquished in exchange for the payments at issue in this case. The illegal deprivation of those rights would have given rise to a cause of action for damages, and those damages recovered would not be taxable under the Sixth Circuit's reasoning in *Gerbec*. Likewise, the payments made for the sale of those rights would not constitute remuneration for employment, just as the payment made to buy out the remaining years of the five-year contract in Revenue Ruling 58–301 was not "wages" subject to FICA.

The Court finds, therefore, that the payments made to the public school teachers in exchange for their tenure rights, that is, the right to continued employment absent just cause for termination, pursuant to the early retirement incentive plans outlined earlier, were not "wages" within the meaning of FICA, 26 U.S.C. § 3121(a). The tax should not have been assessed on those payments, and the plaintiff's claim for a refund should have been allowed.

## III.

The Court concludes that the plaintiffs' claims for refunds of FICA taxes withheld and remitted to the government are valid and should have been allowed. Accordingly, it is **ORDERED** that the plaintiff's motion fort summary judgment [dkt # 48] is **GRANTED.**

It is further **ORDERED** that the defendant's motion for summary judgment [dkt # 46] is **DENIED.**

It is further **ORDERED** that the parties shall present an agreed form of judgment in compliance with Fed.R.Civ.P. 23(c)(3) on or before **August 16, 2004.** The plaintiffs' counsel shall submit supporting memoranda and affidavits in support of their request for attorney fees on or before **August 16, 2004,** to which the defendant may respond on or before **August 30, 2004.**