*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0190p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

No. 04-2068
DONALD F. APPOLONI, SR., RUSSELL C.
BERGEMANN, and CHARLES BRYCE ENGLE,
                    *Plaintiffs-Appellants,*

                    *v.*

UNITED STATES OF AMERICA,
                    *Defendant-Appellee.*

No. 05-1049
PHYLLIS F. KLENDER, WILLIAM B. RASE, and ROGER
J. PETRI,
                    *Plaintiffs-Appellees,*

                    *v.*

UNITED STATES OF AMERICA,
                    *Defendant-Appellant.*

Nos. 04-2068; 05-1049

Appeal from the United States District Courts
for the Western District of Michigan at Lansing
and the Eastern District of Michigan at Bay City.
Nos. 02-00176; 02-10082—Gordon J. Quist and
David M. Lawson, District Judges.

Argued: January 27, 2006

Decided and Filed: June 7, 2006

Before: KENNEDY, COOK, and GRIFFIN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** John M. West, BREDHOFF & KAISER, Washington, D.C., for Plaintiffs. Ellen Page
Delsole, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Defendant.
**ON BRIEF:** John M. West, BREDHOFF & KAISER, Washington, D.C., Suzanne K. Clark, LEE
& CLARK, Southfield, Michigan, for Plaintiffs. Ellen Page Delsole, Kenneth L. Greene, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Defendant.

KENNEDY, J., delivered the opinion of the court, in which COOK, J., joined.  GRIFFIN, J. (pp. 11-19), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

KENNEDY, Circuit Judge.  In these cases consolidated on appeal, we address whether payments made to public school teachers, who relinquished their  statutory tenure rights and resigned from their positions upon accepting the payments, constitute "wages" taxable under the Federal Insurance Contribution Act ("FICA").  *Appoloni v. United States* was filed in the United States District Court for the Western District of Michigan; *Klender v. United States*  was filed in the United States District Court for the Eastern District of Michigan.  In each case, both parties filed cross-motions for summary judgment.  In *Appoloni*, the district court granted summary judgment for the government; in *Klender*, the court granted summary judgment for the Plaintiffs.  For the following reasons, we hold that the payments made in exchange for the relinquishment of statutorily granted tenure rights constitute "wages" taxable under FICA.  Thus, we **REVERSE** the district court's judgment in *Klender*, and we **AFFIRM** the court's judgment in *Appoloni*.

## *BACKGROUND*

On March 27, 2002, three taxpayers filed suit in the Eastern District of Michigan.  On November 21, 2002, three taxpayers brought suit in the Western District of Michigan. Both lawsuits were certified as class actions and differ only in minor respects not relevant here.  In general, the class encompasses all former employees of Michigan school districts and public post-secondary education institutions, residing in the Eastern (*Klender*) and Western (*Appoloni*) Districts of Michigan who received early retirement incentive payments from their respective school districts and who unsuccessfully applied to the Internal Revenue Service ("IRS") for refunds of FICA taxes withheld from those payments.

### I. *Appoloni*

Plaintiffs, Donald Appoloni, William Bergemann, and Sandra Engle, were tenured public school teachers employed by the Dowagiac Union Public School District (the "School District"). All three had been granted tenure by the School District pursuant to the Michigan Teachers' Act ("Tenure Act") Mich. Comp. Laws § 38.71.  In Michigan, a teacher automatically earns tenure by successfully completing a probationary period.  *See* Mich. Comp. Laws § 38.71.  As tenured teachers, Plaintiffs were entitled to continued employment with their respective school districts absent "reasonable and just cause" and subject to the procedural protections set forth in the Tenure Act.

During the 2000-2001 school year, the School District offered an early "employee severance plan" ("ESP") to its most senior teachers.  Teachers who had at least ten years of service with the School District and were at a high step in the pay scale, were eligible to participate in the plan. Participation in the plan was voluntary, and the plan provided that if more than 30 eligible teachers applied, eligbililty to participate would be determined on the basis of seniority.  The purpose of this plan was to "help prevent teacher layoffs and to lessen the Board's economic responsibility in the area of staffing."  J.A. at 77.

Participants in the ESP were required to resign as of June 30, 2001, and to agree to a waiver providing that the teacher "waived all claims arising out of employment with the District, including claims . . . under the Tenure Act."  Additionally, participating teachers agreed to "waive . . . all entitlement to future wage and benefit increases, all rights to participate in any district sponsored

benefit plans" and agreed to not "apply for reemployment" without the School District's consent. J.A. at 81. Participating teachers received the equivalent of their 1999-2000 annual base salary (but not more than $53,021) in 60 monthly payments over a five-year period. J.A. at 25.

The School District withheld FICA taxes from the installment payments. Relying on the Eighth Circuit's decision in *North Dakota State Univ. v. United States*, 255 F.3d 599 (8th Cir. 2001), the taxpayers filed claims for refunds of the FICA taxes withheld, and when the IRS denied those claims, the taxpayers filed suit in the Western District of Michigan.

Both the Plaintiffs and the government filed motions for summary judgment. The district court granted the government's motion and denied the Plaintiffs' motion. Plaintiffs filed this timely appeal.

## II. *Klender*

The *Klender* litigation similarly involves tenured teachers who were offered an "Employee Severance Plan" designed to induce tenured teachers to retire. In *Klender*, all three Plaintiffs - Phyllis F. Klender, Roger J. Petri, William B. Rase - were employed as Michigan public school teachers and also had been granted tenure pursuant to the Tenure Act.

Plaintiff Klender accepted a buyout that the Pinconning Area School District offered her during the 1999-2000 school year. The buyout was offered to teachers with 20 or more years of service with the district. Any eligible teacher who agreed to retire as of June 30, 2000, would receive a payment of $46,800 made in 72 monthly installments over six years. In exchange, teachers were required to "waive . . . all future employment rights," to agree not to apply for re-employment in the district without the district's consent, and to "waive and release the District forever from rights to re-employment and from any claims based, inter alia, on her 'tenure rights.'" J.A. at 47.

Plaintiff Petri accepted a "Voluntary Teacher Severance Incentive Program" offered by the Pinconning Area School District to teachers with ten or more years of service. If an eligible teacher agreed to "voluntarily resign his or her employment with Pinconning Area Schools [and] forfeit all seniority rights," the teacher would receive a minimum guaranteed payment of $2,000. That payment increased to a total of $37,500 if ten or more eligible teachers opted to participate in the program. Plaintiff Petri accepted the buyout offer on February 17, 1997.

Plaintiff Rase also accepted a buyout that was offered pursuant to an "early retirement" provision in a collective bargaining agreement between the West Branch-Rose City Area School District and the West Branch-Rose City Education Association. Teachers with a minimum of 20 years' service in the District and 25-29 years' credit under the Michigan Public School Employees' Retirement Plan qualified for an early retirement incentive. Incentive payments began at $30,00 for teachers with 25 years and decreased by $5,000 for each additional year of retirement credits up to 29. On January 24, 2001, Plaintiff Rase announced his retirement.

In making these buyout payments to Plaintiffs Klender, Petri, and Rase, the school districts withheld FICA taxes from the amount paid. Between August and October of 2001, all three Plaintiffs filed claims for refunds with the IRS. The IRS denied the claims. Plaintiffs then filed this action in the Eastern District of Michigan. Both parties filed cross motions for summary judgment. The district court denied the government's motion and granted the Plaintiffs'. This appeal followed.

## STANDARD OF REVIEW

We review a district court's grant of a motion for summary judgment *de novo. Wojcik v. City of Romulus,* 257 F.3d 600, 608 (6th Cir. 2001). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). "There is no such issue unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . [T]he inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 243 (1986). "The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). "When reviewing cross-motions for summary judgment, we must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc*., 336 F.3d 503, 506 (6th Cir. 2003).

## *ANALYSIS*

This case presents an issue of first impression in this circuit: are payments made by school districts to public school teachers in exchange for the relinquishment of those teachers' statutorily granted tenure rights considered "wages" taxable under FICA?

FICA, codified in Chapter 21 of the Internal Revenue Code, Sections 3101 through 3128, imposes a tax upon the wages of employees to fund Social Security and Medicare Benefits. This tax is collected by the employer by deducting the tax from wages at the time of payment. Section 3111 imposes a matching tax on the employer with respect to wages paid to the employee.

Plaintiffs argue that the payments in this case should not be considered "wages" for purposes of FICA, and therefore, FICA taxes were wrongly withheld from those payments. Plaintiffs rely on an Eighth Circuit decision, *North Dakota State Univ. v. United States,* 255 F.3d 599 (8th Cir. 2001), for this proposition. In *North Dakota*, payments were made to tenured university professors pursuant to an early retirement program. That court held that those payments were not "wages" for FICA purposes.

The government argues that *North Dakota* is distinguishable and that the payments at issue in this case easily fit within the statutory definition of "wages," and thus, the taxes were properly withheld.

### I.

We begin by examining the definition of "wages" for purposes of FICA. Section 3121(a) of the Internal Revenue Code defines "wages" as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." Section 3121(a) lists exceptions to this expansive definition but none apply here. "Employment" is defined, in I.R.C. § 3121(b), as "any service, of whatever nature, performed (A) by an employee for the person employing him." "Remuneration for employment," unless specifically excepted, "constitutes wages even though at the time paid the relationship of employer and employee no longer exists between the person in whose employ the services were performed and the individual who performed them." Treas. Reg. § 31.3121(a)-1(i). As explained in Treas. Reg. § 31.3121(a)-1(c), "[t]he name by which the remuneration for employment is designated is immaterial"; "salaries, fees, bonuses, and commissions . . . are wages if paid as compensation for employment." Congress, by enacting FICA, intended to impose FICA taxes on a broad range of remuneration in order to accomplish the remedial purposes of the Social Security Act. See H.R. Rep. No. 74-615, at 3 (1935) (describing the aims of the Social Security Act).

Both the Supreme Court and this circuit have emphasized the broad, inclusive nature of this definition. For example, in *Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358, 365-66 (1946), the Supreme Court held that back pay awarded to wrongfully discharged employees under the National Labor Relations Act constituted "wages" for purposes of the Social Security Act of 1935. The Court

specifically rejected the argument that "service" as used in the Act should be limited to "only productive activity" and emphasized the broad nature of the definition of FICA "wages":

> The very words 'any service . . . performed . . . for his employer,' *with the purpose of the Social Security Act in mind import breadth of coverage*. They admonish us against holding that 'service' can be only productive activity. We think that 'service' as used by Congress in this definitive phrase means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer.

*Id.* (emphasis added) (quoting I.R.C. § 3121(a)).

In this circuit, we have followed the reasoning of *Nierotko* and have also emphasized that the "phrase 'remuneration for employment' as it appears in § 3121 should be interpreted broadly." *Gerbec v. United States*, 164 F.3d 1015, 1026 (6th Cir. 1999). In *Gerbec*, employees were laid off just before qualifying for pension benefits and they sued under the Employment Retirement Income and Security Act of 1974. The parties settled and the employees received payments pursuant to a settlement agreement. While we found that some of those payments constituted damages for a tort-type personal injury claim and thus were exempt from FICA taxes, we held that damages compensating the plaintiffs for *lost wages*— including back wages or future wages—were subject to income and FICA taxes. We reasoned:

> The holding in *Nierotko* clearly supports the conclusion that awards representing a loss in wages, both back wages and future wages, that otherwise would have been paid, reflect compensation paid to the employee because of the employer-employee relationship, regardless of whether the employee actually worked during the time period in question.

*Id.* Thus, under the holding in *Gerbec*, had the Plaintiffs been terminated without cause and thus wrongfully denied the right they gave up in this case—the right to continued "for cause" employment— those "front pay" wages would have been subject to FICA taxation. *See id.* This is in contrast to the erroneous conclusion by the district court in *Klender*, "[t]he illegal deprivation of [Plaintiffs'] rights would have given rise to a cause of action for damages, and those damages recovered would not be taxable under the Sixth Circuit's reasoning in *Gerbec.*" *Klender v. United States*, 328 F. Supp. 2d 754, 767 (E.D.Mich. 2004).

Both *Nierotko* and *Gerbec* demonstrate the way in which courts have broadly interpreted the definition of "wages" for purposes of FICA.[1] The dissent indicates that our result is "largely ordained" by our choice to define this statute broadly. While we maintain such a construction of this statute is proper, we find a broad construction is not necessary, as we hold the facts presented easily fit within the definition of "wages," for the following reasons.

---

[1]The dissent claims that in *Rowan Companies, Inc. v. United States*, 452 U.S. 247 (1981), the Supreme Court rejected "any notion that § 3121 should be interpreted broadly." (emphasis added). Neither the holding in *Rowan* - nor the passage quoted by the dissent from *Rowan* - stands for this proposition. The Court in *Rowan* stated that it was not persuaded by the argument that Congress intended "remuneration" to include a broad range of remuneration which included, in that case, the payment of meals and lodging. The Court did not cite to *Nierotko*, nor did it purport to alter its previous finding that, "[t]he very words 'any service . . . performed . . . for his employer,' with the purpose of the Social Security Act in mind import breadth of coverage." *Nierotko*, 327 U.S. at 365-66 (emphasis added). We further note that we have no disagreement with the principle that courts should look to the language of a statute when interpreting a statute; however, we emphasize that courts also should look to the way in which both the Supreme Court and our court have indicated a statute is to be interpreted - and in the case of FICA "wages," that's broadly.

A.

First, the eligibility requirements for qualifying for a payment—that a teacher served a minimum number of years—indicate the payments were for services performed rather than for the relinquishment of tenure rights. In determining whether a payment constitutes wages, courts have looked to eligibility requirements, specifically longevity, as an important factor. *See Sheet Metal Workers Local 141 Supplemental Unemployment Benefit Trust Fund v. United States*, 64 F.3d 245, 250 (6th Cir. 1995); *Associated Elec. Coop., Inc. v. United States*, 226 F.3d 1322, 1328 (Fed. Cir. 2000); *Abrahamsen v. United States,* 228 F.3d 1360, 1365 (Fed. Cir. 2000). We have consistently held that where a payment arises out of the employment relationship, and is conditioned on a minimum number of years of service, such a payment constitutes FICA wages.

For example, in *Sheet Metal*, we addressed whether distributions to employees from a Supplemental Unemployment Benefit Fund were wages for FICA purposes. *Sheet Metal,* 6 F.3d at 250. The distributions were derived solely from employer contributions, and eligbililty for those distributions was contingent on an employee's length of service. We evaluated whether those payments were "remuneration for employment" and stated that "eligibility requirements provide the *most accurate* test to determine whether a payment is truly in consideration for services." *Id.* at 251 (emphasis added); *see also Associated Elec. Coop., Inc.,* 226 F.3d at 1328 (noting that while the method of computing severance payments, including the length of service and pay rate, were not "dispositive," the method is "a relevant factor in determining whether the payments constitute 'wages'"); *Abrahamsen*, 228 F.3d at 1365 (finding that severance payments constituted FICA wages based in part on the fact that the employer used a "formula based on the departing employee's salary and years of service")*; Cohen v. United States*, 63 F. Supp. 2d 1131, 1134 (C.D. Cal. 1999) (finding that the severance payment was subject to FICA tax where it was only available to employees with twenty or more years of continuous service and noting that courts "look to the eligbililty requirements for determining whether the payments are compensation for services"); *Hemelt v. United States*, 122 F.3d 204, 210 (4th Cir. 1997) ("[K]ey factors in determining the amounts of each award were the length of each employee's tenure with Continental and the salary he received from Continental. . . . [B]ecause the payments from Continental to taxpayers and other class members arose out of their employment relationship, they fit within the statutory and regulatory definition of wages, and FICA taxes were properly withheld from the awards.").

In this case, the severance payments were conditioned upon a teacher having served a certain number of years—exceeding that of obtaining tenure under Michigan law—with the school district. In *Appoloni*, the school district offered a severance payment to teachers who had at least ten years of service with the School District and who were at a high step in the pay scale. Similarly, in *Klender*, the severance payments were only offered to those teachers who had served for a certain number of years in excess of that required to achieve tenure: Klender accepted a buyout requiring 20 or more years of service with the district; Petri accepted a severance package requiring ten or more years of service; and Rase accepted a buyout that was offered to teachers with a minimum of 20 years of service.

Plaintiffs necessarily had to have tenure to be eligible for the buyout. However, longevity—not tenure—was the key factor for determining eligibility because these early retirement payments were offered to encourage teachers at a high pay rate to retire. Thus, the payments at issue in this case, like those in *Sheet Metal*, arose out of the employment relationship, and were conditioned on a minimum number of years of service.

B.

Plaintiffs make much of the fact that they gave up their rights as tenured teachers to continued employment absent just cause for termination. They argue that because the payments

were in exchange for the relinquishment of that right, the payments are not "wages" taxable under FICA. This leads us to our next point: just because a teacher relinquishes a right when accepting early retirement does not convert what would be FICA wages into something else.

Plaintiffs maintain that the school districts were "buying" their tenure rights. This point also greatly influences the dissent. Yet, a court must not look simply at what is being relinquished at the point a severance payment is offered, but rather, how the right relinquished was earned. Thus, we cannot understate the importance of the fact that a teacher *earns tenure* by successfully completing a probationary period (Mich. Comp. Laws § 38.71). In other words, a teacher does not obtain tenure at the onset of employment; it is a right that is earned like any other job benefit. Admittedly, the grant of this right is guaranteed and protected by statute. But we fail to see how the fact that this right is protected by statute takes away from the point that it still must be earned through services to the employer.[2]

In any event, the payments at issue were not in exchange *solely* for the tenure rights; they were in exchange for the teachers' early retirement, and, as such, were essentially severance payments. We fail to see how this is different from other severance packages just because a "tenure" right was exchanged. In almost all severance packages an employee gives up something, and we have a hard time distinguishing this case from similar cases where an employee, pursuant to a severance package, gives up rights in exchange. Courts have consistently held that severance payments for the relinquishment of rights in the course of an employment relationship are FICA wages. In fact, we are at a loss to find a case, other than the Eighth Circuit's decision, to hold otherwise.

For example, in *Abrahamsen*, severance payments were conditioned on employees waiving all future claims against the employer. *Abrahamsen*, 228 F.3d 1360. The court noted that the payments were "intended both to induce employees to leave and to settle any claims the employees may have had against IBM." *Id.* at 1364. However, the court found that even though the plaintiffs were relinquishing this right and even though the employer offered this payment, in part, because plaintiffs waived this right, this did not change the wage-like character of the severance payments and those payments were subject to the FICA tax. *Id.; see also Cohen*, 63 F. Supp. 2d at 1135 (finding severance payments subject to FICA tax where plaintiffs voluntarily accepted severance package and, in doing so, waived all rights against the defendant to future employment).

Similarly, in *Associated Electric*, the plaintiff-taxpayers argued their severance payments were not "wages" because the payments were made to union employees "in exchange for valuable rights, *i.e.*, the union's promise not to strike, and thus were not for services performed." *Associated Electric*, 226 F.3d at 1328. Like the court in *Abrahamsen*, the court found that because the employer's motivations "were not solely to avoid labor unrest," the payments constituted FICA "wages." *Id.*

In this case, the school district's motivation was not to buy tenure rights— the motivation was to induce those teachers at the highest pay scales to retire early.[3] Relinquishment of tenure rights was simply a necessary and incidental part of accepting the buyout. In other words, in order to offer the teachers a buyout, the school districts had to ask that they give up their right to future

---

[2]We note that the dissent fails to provide any explanation for why the fact the grant of tenure rights is protected by a statute is important in this case. Many benefits bestowed upon employees are protected by statute - for example, the right to bring suit - but courts have not found this point to be of any import when holding that severance packages in exchange, in part, for the relinquishment of such rights are taxable under FICA. *Abrahamsen,* 228 F.3d 1360.

[3]For example, in *Appoloni*, the stated purpose of the plan was to "help prevent teacher layoffs and to lessen the Board's economic responsibility in the area of staffing." J.A. at 77.

employment—the same as with any severance package  Thus, especially in light of the school district's purpose in offering these severance payments, we see no reason to differentiate the relinquishment of tenure rights from the relinquishment of other benefits earned during the course of employment, like the right to bring suit, or rights associated with seniority.

C.

Finally, we agree with the government's position that the most applicable revenue ruling indicates the severance payments are FICA "wages."  Revenue rulings are not entitled to the same degree of deference accorded a statute however, some degree of deference is appropriate depending upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944); *Aeroquip-Vickers, Inc. v. Comm'r,* 347 F.3d 173, 180 (6th Cir. 2003) (finding revenue rulings receive *Skidmore* deference); *but c.f. Ammex, Inc. v. United States ,* 367 F.3d 530, 535 (6th Cir. 2004) (finding revenue rulings get the same deference as Treasury Regulations).  Consideration of all of these factors leads us to conclude that some deference is due to Revenue Ruling 58-301 and Revenue Ruling 75-44.

Plaintiffs argue this case is most analogous to Revenue Ruling 58-301,[4] the revenue ruling relied on by the Eighth Circuit in *North Dakota*.  In Revenue Ruling 58-301, an employee with a five-year contract right to employment agreed to relinquish that right during the second year in exchange for a lump sum payment.  The IRS concluded that payments for relinquishment of rights under a contract are not "wages" under FICA.

The government contends this case presents an issue more closely related to Revenue Ruling 75-44, where an employee, under a general contract, "*acquired both the rights to security in his employment* and to additional pay or other recognition for longevity" based on his years of service to the employer.  Rev. Rul. 75-44 (emphasis added).  In exchange for the employee's agreement to refrain from asserting either his seniority rights or job security rights, the employee received a lump sum payment.  The IRS held that because the employee "had acquired his relinquished employment rights through his previous performance of services," the payment constituted remuneration for services under the Railroad Retirement Act (the counterpart of FICA for railroad employees).  *Id.* We agree with the government and find Revenue Ruling 75-44 to be the most analogous revenue ruling.

In Revenue Ruling 58-301, the employee was granted, at the time of employment, a *contractual right* to employment for five years.  In contrast, the Plaintiffs received their statutorily-granted tenure rights after a certain requisite number of *years of service*.  As previously emphasized, in Michigan, tenure is automatically granted, pursuant to a statute, after a teacher completes a probationary period.  We see this case as one where the teacher earned tenure through his/her "previous performance of services."  Rev. Rul. 75-44.  Thus, the most analogous revenue ruling, Revenue Ruling 75-44, also indicates that the severance payments at issue are FICA wages.

---

[4]The governments points to a recently issued revenue ruling, Rev. Rul. 2004-110 which purports to supercede Revenue Rulings  58-301 and 55-520 (which Rev. Rul. 58-301 relied on). Revenue Ruling 2004-110 explains that those earlier rulings "erred in their analysis by failing to apply the Code and regulations appropriately to the question of whether the payments made in cancellation of the employment contract were wages."  However, Revenue Ruling 2004-110 was issued after the district courts issued opinions in both *Appoloni*  and *Klender*.  In Revenue Ruling 2004-110, the IRS stated that it would not apply to payments made by an employer prior to January 12, 2005.  Because a large portion of the payments to which plaintiffs were entitled under the buyout agreements were made prior to this date, and because we hold that Revenue Ruling 75-44 is analogous to the facts of this case, we decline to rely on Revenue Ruling 2004-110 in making our decision.

II.

We recognize our holding, and our reliance on Revenue Ruling 75-44, differs from what the Eighth Circuit held in *North Dakota*; however we believe that we have reached the correct result.[5] As stated in *CSX Corp. Inc. v. United States* , 52 Fed. Cl. 208 (Ct. Fed. Cl. 2002), where the United States Court of Federal Claims disagreed with the holding in *North Dakota*:

> [R]ights to vacation pay, sick pay, layoff pay, *and seniority* -- constituted part of the employee's total compensation package and, hence, constituted wages. Therefore, when these job-related benefits are relinquished in favor of a lump-sum payment, the transaction simply amounts to a redemption, paid in cash, of wage amounts previously paid in kind. Because a separation payment is simply an exchange of equivalent values, what were wages at the start remain wages at the end.

*Id.* at 221 (emphasis added). For the reasons previously discussed, we agree with the reasoning of the court in *CSX.* In doing so we give effect to Congress' definition of wages as "all remuneration for employment, *including the cash value of all remuneration (including benefits) paid in any medium other than cash.*" I.R.C. § 3121(a) (emphasis added). Tenure rights were previously paid in kind—job security—and now are being paid in cash.

To summarize, we find of it of great significance that the tenure rights at issue were *earned through service to the employer.* This is for two reasons. First, we see no reason to differentiate tenure rights from any other right an employee earns through service to any employer. As discussed, courts have found the relinquishment of seniority rights, rights to bring suit, and other types of rights in exchange for a severance payment constitute FICA wages. *See e.g. Abrahamsen*, 228 F.3d 1360 (severance payments conditioned upon employees waiving all future claims against the employer); *Associated Elec.*, 226 F.3d at 1328 (severance payments were not "wages" because the payments were made to union employees in exchange for the union's promise not to strike); *Cohen*, 63 F. Supp. 2d at 1135 (court found severance payments subject to FICA tax where plaintiffs voluntarily accepted severance payments and, in doing so, waived all rights against the defendant to future employment). Secondly, because these rights were earned through service rather than contracted for at the time of employment, this suggests Rev. Rul.75-44 is more on point than Rev. Rul. 58-301.[6]

We also want to again emphasize the importance of the school district's principal purpose in offering these severance payments. The school district's purpose here was not to "buy" tenure rights. It was to induce those at the highest pay scales to voluntarily retire early. Relinquishment of tenure rights was incidental to the acceptance of the severance payment. A school district could not offer an early retirement payment and permit the teacher to keep his/her tenure and remain employed. The relinquishment of these tenure rights—like the relinquishment of the rights in *Abrahamsen* and *Associated Electric*— was necessary to accepting the severance payment.

---

[5] We also note that *North Dakota* is factually distinguishable. In *North Dakota*, even though the monetary amount of any individuals rights was determined, at least partially, by length of service, the tenure rights in *North Dakota* were created by a single contract made at the onset of the tenure relationship. *North Dakota*, 255 F.3d at 601. Tenure, moreover, was not automatic; the North Dakota Board of Higher Education considered several factors in making tenure determinations, "including scholarship in teaching, contribution to a discipline or profession through research, other scholarly or professional activities, and service to the institution and society." *Id.*

[6] Notably, we are not presented with a scenario where a severance payment is exchanged for the relinquishment of rights contracted for *at the time of employment*. We point this out only to emphasize that we need not rely on the recently issued Revenue Ruling 2004-110 in making this decision; and thus, we decline to comment about whether, in light of this recently issued ruling, a severance payment in exchange for rights granted to an employee at the time of employment constitutes FICA wages.

Thus, we find that the severance payments at issue easily fall within the definition of FICA wages as "all remuneration for employment." I.R.C. § 3121(a).

### *CONCLUSION*

For the foregoing reasons we **AFFIRM** the district court's judgment in *Appoloni* and we **REVERSE** the district court's judgment in *Klender* and remand with instructions to enter summary judgment for the government.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part. I concur in the result regarding plaintiff William B. Rase. However, I respectfully dissent as to the other plaintiffs ("plaintiffs"). On this significant tax question for which "[u]niformity among the circuits is especially important in tax cases to ensure equal and certain administration of the tax system," *Nickell v. Comm'r*, 831 F.2d 1265, 1270 (6th Cir. 1987), I would follow the persuasive authority of *North Dakota State University v. United States*, 255 F.3d 599 (8th Cir. 2001). In doing so, I would hold that the payments at issue, with the exception of the payments to plaintiff William Rase, do not constitute "wages" for purposes of the Federal Insurance Contributions Act ("FICA"), I.R.C. §§ 3101-3128. Accordingly, I would affirm the grant of summary judgment in favor of plaintiffs in *Klender* and reverse the grant of summary judgment in favor of the United States in *Appoloni*.

I.

Both cases are certified class actions encompassing former employees of Michigan school districts and public post-secondary educational institutions residing in the Western (*Appoloni*) and Eastern (*Klender*) Districts of Michigan who received early retirement incentive payments from their employers and unsuccessfully applied to the Internal Revenue Service ("IRS") for refunds of FICA taxes withheld on such payments during the previous two years. The facts in each of the cases are not in dispute. Because key facts affect my disagreement with the majority's analysis and conclusion, I will briefly recite the facts crucial to my resolution.

A.      *Appoloni v. United States*

The representative plaintiffs, Donald Appoloni, William Bergemann, and Sandra Engle, are former public school teachers in the Dowagiac Union School District ("Dowagiac") who possessed tenure rights pursuant to the Michigan Teachers' Tenure Act (the "Tenure Act"), Mich. Comp. Laws §§ 38.71 to 38.191. A public school teacher obtains tenure after satisfactorily completing a four-year (formerly two-year) probationary period of employment, Mich. Comp. Laws § 38.81, and thereafter may be discharged or demoted only "for reasonable and just cause and only as provided in [the Tenure Act]," Mich. Comp. Laws § 38.101. Tenure status also entitles a teacher to a shorter probationary period in any other Michigan school district. Mich. Comp. Laws § 38.92. Appoloni obtained tenure in 1990, Bergemann obtained tenure in 1970, and Engle obtained tenure in 1975.

Appoloni, Bergemann, and Engle all opted to participate in the Employee Severance Plan ("ESP"). The plan is described by plaintiffs as follows:

> Under the plan, teachers who (a) had at least ten years' service with the School District, and (b) were at the highest step of the applicable pay scale, were eligible to elect to participate in the plan by indicating their intent during a window period from November 13, 2000 to January 9, 2001. . . . The plan provided that if more than 30 eligible teachers applied, participation would be determined on the basis of seniority, and that if fewer than 15 applied the plan would be cancelled. *Id.*

> Participants in the buyout plan were required to resign from employment with the School District as of June 30, 2001, to "waive . . . all future employment rights, all entitlement to future wage and benefits increases, all rights to participate in any district-sponsored benefit plans," and to "agree not to apply for reemployment" without the School District's consent. . . . In consideration for giving up these rights

to future employment, participating teachers were to receive the equivalent of their 1999-2000 annual base salary (but no more than $53,021), in 60 monthly payments over a five-year period. Teachers' participation in the buy-out plan was entirely voluntary.

### B.      *Klender v. United States*

The material facts of *Klender* are substantially similar to the facts of *Appoloni*. Plaintiffs Phyllis Klender and Roger Petri were both employed by the Pinconning Area School District ("Pinconning"), although they retired at slightly different times and therefore participated in different severance plans. Plaintiff William Rase was employed by the West Branch-Rose City Area School District ("West Branch-Rose"). The features of the applicable severance plans are outlined below.

### 1.      *Phyllis Klender*

Like Dowagiac, Pinconning also created an Employee Severance Plan ("ESP") designed to induce long-term employees to leave their jobs. The plan was available to teachers who had twenty or more years of service with Pinconning as of June 30, 2000. All teachers who accepted the ESP were paid the same amount: $46,800 if retired by June 30, 2000; and $43,200 if retired by June 30, 2001. The uniform ESP payment amount was arbitrary in the sense that it bore no relationship to an individual teacher's loss of actual wages. The Pinconning employees also agreed to give up all future employment rights, including "any and all claims existing in equity or law under federal and state law or board policy pertaining to any right to reappointment or tenure rights by virtue of any expressed agreements or oral understandings." The employees further relinquished any right to bring suit against the school district under "Title VII of the U.S. Civil Rights Act of 1964 or any other statute, constitutional provision or common law theory related to employment, employment discrimination or his/her separation from employment" and under the "Age Discrimination in Employment Act of 1967 and the Older Workers Protection Act of 1990."

Phyllis Klender, a tenured teacher eligible for the plan, agreed to participate and retired effective June 30, 2000, after signing the requisite releases. After Pinconning deducted FICA taxes from subsequent severance plan payments distributed to Klender, Klender timely filed a claim for a refund with the IRS. On January 23, 2002, the IRS denied Klender's claim for a refund.

### 2.      *Roger Petri*

Pinconning offered Roger Petri a similar plan in 1996. All teachers with a minimum service of ten years were eligible to receive the uniform sum of $37,500, irrespective of an individual's loss of actual wages. Like Klender's plan, Petri's ESP plan required him to relinquish rights to continued employment. Although the 1996 agreement did not specifically list tenure rights, participating employees agreed

> to fully and completely waive, discharge, release and hold Pinconning Area Schools and the Pinconning Area Education Association harmless . . . from any and all liability, claims, charges, demands and/or causes of action of any kind whatsoever . . . including, but not limited to, claims for breach of contract, deprivation of constitutional rights, claims of wrongful discharge and/or claims of discrimination. . . .

The agreement further "acknowlege[d] that the Program benefit constitutes compensation which the Teacher would not otherwise be entitled to."

Having obtained tenure in 1973, Roger Petri qualified for the severance program and, accordingly, accepted the buy-out offer, which included the release document, in February of 1997. As with Klender, Pinconning deducted FICA taxes from the ESP payments Petri received. On August 29, 2001, Petri filed a claim for a refund with the IRS for FICA taxes withheld on the payments he received , and, on October 23, 2001, the IRS denied Petri's claim for a refund.

### 3.          *William Rase*

William Rase worked in the West Branch-Rose School District. Like the other districts, West Branch-Rose devised a plan to give qualified teachers a fixed sum in exchange for the teachers' agreement to retire early. The West Branch-Rose plan differed, however, because it was included in the "Master Agreement;" that is, the contract between the school district and the chapter of the teacher's union that represented the district's teachers, including Rase. The actual sum an employee received was dependent upon the number of years the teacher was involved in a Michigan public employees' retirement plan and varied between $10,000 and $30,000. Unlike the other ESPs, there was no admissible evidence presented that the teachers who chose to participate in the early retirement plan were contractually required to release statutory rights to receive the severance payments. Nevertheless, Rase claims, by way of affidavit, that the payments were contingent upon the relinquishment of his tenure rights in exchange for the ESP payments. Rase qualified for the early retirement plan because he was employed by West Branch-Rose as a teacher since 1979 and achieved tenure in 1981. After Rase committed to the plan in early 2001, West Branch-Rose subsequently deducted FICA taxes from the payments to Rase. Like the other plaintiffs, Rase unsuccessfully filed a claim for a refund with the IRS.

I concur in the result reached by the majority with respect to William Rase. I would hold that the claim by Rase fails when confronted by the government's motion for summary judgment because there was no obligation by Rase to relinquish his statutory tenure rights. Although Rase proffered his subjective opinion, by affidavit, that the payment was contingent upon his relinquishment of claims pursuant to the Michigan Tenure Act, no factual evidence supports this conclusory assertion. FED. R. CIV. P. 56(e). Accordingly, I concur with the majority that Rase's ESP payments were subject to FICA taxes.

II.

These cases present an issue of statutory construction. In this regard, the inquiry begins with the fundamental purpose of judicial construction of statutes, which is to ascertain and give effect to the original meaning of the words used by Congress:

> [W]e begin with the understanding that Congress "says in a statute what it means and means in a statute what it says there," *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254, 112 S. Ct. 1146, 117 L.Ed.2d 391 (1992). As we have previously noted in construing another provision of § 506, when "the statute's language is plain, 'the sole function of the courts'" – at least where the disposition required by the text is not absurd – "'is to enforce it according to its terms.'" *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S. Ct. 192, 61 L.Ed. 442 (1917)).

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).

As Justice Scalia has further elaborated:

The text is the law, and it is the text that must be observed. I agree with Justice Holmes's remark, quoted approvingly by Justice Frankfurter in his article on the construction of statutes: "Only a day or two ago – when counsel talked of the intention of a legislature, I was indiscreet enough to say I don't care what their intention was. I only want to know what the words mean."[28] And I agree with Holmes's other remark, quoted approvingly by Justice Jackson: "We do not inquire what the legislature meant; we ask only what the statute means."[29]

---

[28] Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 538 (1947).

[29] Oliver Wendell Holmes, *Collected Legal Papers* 207 (1920), *quoted in Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 397 (1951) (Jackson, J., concurring).

---

ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 22-23 (1997).

The FICA defines "wages" as "all remuneration *for employment*, including the cash value of all remuneration (including benefits) paid in any medium other than cash. . . ." 26 U.S.C. § 3121(a) (emphasis added). "Employment" is further defined as "*any service*, of whatever nature, performed . . . by an employee for the person employing him. . . ." *Id.* at § 3121(b) (emphasis added). Thus, the statute's plain language raises the issue of whether the plaintiffs received their ESP remuneration for "any service" performed by them for their employer.

Where, as here, no statutory definitions exist, courts may refer to dictionary definitions for guidance in discerning the plain meaning of a statute's language. *United States v. Edward Rose & Sons*, 384 F.3d 258, 263 (6th Cir. 2004); *Cleveland v. City of L.A.*, 420 F.3d 981, 989 (9th Cir. 2005); *see MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225-29 (1994) (using dictionary definitions to interpret the word "modify").

The ordinary, common meaning of the word "services" is "[a]n act or a variety of work done for others, especially for pay." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 222 (4th ed. 2000). Other major English language dictionaries are to the same effect:

"An act of serving; a duty or piece of work done for a master or superior. OXFORD ENGLISH DICTIONARY, http://www.oed.com (enter term "service"); "the work performed by one that serves <good service> b : useful labor that does not produce a tangible commodity –usually used in plural <charge for professional services>[,] MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.m-w.com (enter term "service"); "The performance of work or duties for a superior or as a servant . . . . 4. a. Work done for others as an occupation or business," DICTIONARY.COM, http://dictionary.reference.com/ (enter term "service").

After my review of these common definitions and *Social Security Board v. Nierotko*, 327 U.S. 358 (1946), which held that the term "service" is not limited to "productive activity," but includes compensation for the loss of actual wages, I conclude, consistent with the Eighth Circuit, the United States District Court for the Western District of Pennsylvania, and the United States District Court for the Eastern District of Michigan, that the ESP payments were made in exchange

for the relinquishment of plaintiffs' statutory and constitutionally-protected tenure rights, rather than remuneration for "services" to the school districts. Similar to the payment of meals[1] and lodging in *Rowan Companies, Inc. v. United States*, 452 U.S. 247 (1981), and the release of tort claim damages in *Gerbec v. United States*, 164 F.3d 1015, 1026 (6th Cir. 1999), the ESP payments, although arising in the employment setting, were not remuneration for "any service" performed by plaintiffs. Rather, the ESP payments were a "clear, separate, and adequate consideration" exchanged for the relinquishment of plaintiffs' vested and bona fide statutory rights to tenure.

### III.

Prior to *Rowan*, a plausible argument could be made that the term "wages" as used in the FICA should be "broadly construed." *See Nierotko*, 327 U.S. at 355-366. Relying on *Nierotko* and obiter dictum from our decision in *Gerbec*, 164 F.3d. at 1015 ("'remuneration for employment' as it appears in [26 U.S.C.] § 3121 should be interpreted broadly"), the majority reaches a result which is largely ordained by its choice of a rule of statutory construction.

In my view, the statute at issue, like all statutes, should not be construed "broadly," "narrowly," "strictly," or "liberally," but rather fairly and reasonably. In this regard, I agree with Justice Scalia that "[a] text should not be construed strictly, and it should not be construed leniently; it should be construed reasonably, to contain all that it fairly means." SCALIA, A MATTER OF INTERPRETATION at 23.

Furthermore, any notion that § 3121 should be interpreted broadly, rather than fairly and reasonably, was rejected by the Supreme Court in *Rowan,* 452 U.S. at 263. In *Rowan*, the government unsuccessfully argued that the holding of *Central Illinois* should not apply to the term "wages" as contained in the FICA. *Id.* at 251-52.[2] The government contended that the definition of "wages" for purposes of the FICA should be given a broader and more expansive interpretation. *Id.* The government's position was rejected by the Supreme Court, and the treasury regulation at issue was declared invalid. *Id.* at 263. The Court summarized its holding as follows:

> We conclude that Treas. Reg. §§ 31.3121(a)-1(f) and 31.3306(b)-1(f) fail to implement the statutory definition of "wages" in a consistent or reasonable manner. The plain language and legislative histories of the relevant Acts indicate that Congress intended its definition to be interpreted in the same manner for FICA and FUTA as for income-tax withholding. The Treasury Regulations on which the Government relies fail to do so, and their inconsistent and unexplained application undermine the contention that Congress nonetheless endorsed them. As Congress did intend a consistent interpretation of its definition, these Treasury Regulations also are inconsistent with the Court's reasoning in *Central Illinois*.

> We therefore hold that the Regulations are invalid, and that the Service erred in relying upon them to include in the computation of "wages" the value of the meals and lodging that petitioner provided for its own convenience to its employees on offshore oil rigs. The judgment of the Court of Appeals is reversed.

*Id.*

---

[1]*See also Cent. Ill. Pub. Serv. Co. v. United States*, 435 U.S. 21 (1978) (holding reimbursements to employees for expenses did not qualify as "wages").

[2]The government repeats this discredited argument in its appellate brief in *Klender*.

Although Congress amended 26 U.S.C. § 3121(a)[3] in response to *Rowan*, thus allowing differing regulatory treatment of "wages" for purposes of income tax withholding and the FICA, the "broad interpretation" of the definition of "wages" for FICA purposes has not been restored.

After construing the statute at issue in a fair and reasonable manner, consistent with the words used by Congress, I would hold that, with the exception of plaintiff William Rase, the ESP payments were made in exchange for the relinquishment of plaintiffs' statutory and constitutionally protected tenure rights, rather than as remuneration for services to the school districts.[4]

IV.

The weight of authority from the circuits also supports plaintiffs' position. In *Gerbec*, the plaintiffs successfully sued their employer for damages arising from ERISA violations, and a question arose whether the resulting payments were subject to FICA and income taxes. 164 F.3d at 1026. We held that "any damages attributable to wages [plaintiffs] would have received had they not been wrongly terminated should also be subject to the FICA taxes they would have paid on those wages had they not been wrongly terminated." *Id.* at 1026-27. Significantly, we also held that the plaintiffs' tort damages were not subject to FICA taxation. *Id.* In short, only the portion of the damages that compensated plaintiffs for the loss of actual wages[5] was taxable pursuant to FICA. *Id.*

The majority acknowledges this distinction, holding that awards representing a loss in wages that otherwise would have been paid are subject to FICA taxes. Yet there is no question that the severance payments would *not* have been paid had plaintiffs not relinquished their tenure rights. Were it not for their statutory tenure rights, plaintiffs would be at-will employees, subject to discharge without cause or consideration. *See generally Toussaint v. Blue Cross-Blue Shield*, 292 N.W.2d 880 (Mich. 1980). Indeed, this is evidenced by similarly situated employees who worked the same number of years and were entitled to the same salary levels as plaintiffs, who did not receive the ESP payments. The ESP payments therefore were not made in exchange for any "service" that plaintiffs performed or were wrongfully prevented from performing, but, rather, in exchange for the relinquishment of a separate statutory right. Accordingly, the majority's conclusion that any damages arising from a lawsuit following the illegal deprivation of the tenure right would be taxable under *Gerbec* is not correct.

The uniformity in the amount of the ESP payments is further evidence that this consideration was not the sum of each individual teacher's loss of actual wages. The ESP payments are neither tailored, on a case-by-case basis, to the recipient's employment record nor to the recipient's current

---

[3]In 1983, Congress added the following additional language to 26 U.S.C. § 3121(a):

[N]othing in the regulations prescribed for purposes of chapter 24 (relating to income tax withholding) which provides an exclusion from "wages" as used in such chapter shall be construed to require a similar exclusion from "wages" in the regulations prescribed for purposes of this chapter.

Social Security Amendments of 1938, Pub. L. No. 98-21, § 327(b)(1) 97 Stat. 65 (1983).

[4]Were we to employ a result-oriented rule of statutory construction, any doubt should be resolved in favor of the taxpayer, not the government tax collector. *See Hassett v. Welch*, 303 U.S. 303, 314 (1938) ("[I]f doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer . . . .").

[5]In Michigan, plaintiff may sue in tort for loss of earning capacity, rather than loss of actual wages. *Prince v. Lott*, 120 N.W.2d 780 (Mich. 1963); Michigan Supreme Court Committee on Model Civil Jury Instructions, *Michigan Standard Civil Jury Instruction*, 50.06 (2006), http://courts.mi.gov/mcji/MCJI.htm. Damages recovered for loss of earning capacity are not subject to FICA taxation. *Dotson v. United States*, 87 F.3d 682 (5th Cir. 1996).

wage rate. Moreover, the ESP payments are not equivalent to each teacher's loss of earning capacity because the age of each teacher varies considerably. In sum, there is no correlation between the amount of the ESP payments and the teachers' individual employment circumstances that would lend support to the majority's theory that the ESP payments constitute discretely earned wages for purposes of income tax withholding and the FICA. As *Gerbec* holds, remuneration for actual wage loss, past and future, is subject to FICA taxation. However, payment in exchange for the relinquishment of other vested and bona fide claims such as tort and statutory rights are not subject to FICA taxation.

The majority is persuaded that the ESP payments were not made in exchange for the plaintiffs forfeiting their tenure rights by the fact that eligibility to participate in the ESP was conditioned upon a teacher working for a specific duration. This, the majority concludes, is an important, if not dispositive, factor in determining whether payments "arise" from an employment relationship for purposes of FICA taxation. I agree with the proposition that where an employment contract and past service to the employer constitute the consideration for the payment, such payment is indeed inextricably tied to "services" rendered the employer. However, the present circumstances do not yield a similar conclusion. The majority's rationale that the ESP payments were made in consideration of the plaintiffs' past years of service is belied by the fact that similarly situated employees who did not relinquish their tenure rights received nothing. The majority further ignores the critical fact that the rights relinquished by plaintiffs stemmed from the entirely separate grant of authority created by state statute and, thus, required specific relinquishment of statutorily protected tenure rights. For these reasons, I would hold that it was this relinquishment, not the years of service, for which the school districts paid.

In *North Dakota*, the Eighth Circuit examined a materially indistinguishable set of facts, 255 F.3d at 599.[6] Faced with the presentation of a correspondingly similar issue, the *North Dakota* court differentiated the tenured faculty from the non-tenured administrators, stating that "the administrators who were not on the academic staff were [not] anything other than at-will employees entitled only to extended notice before termination." *Id.* at 608. Accordingly, the non-tenured employees' severance payments were subject to FICA taxes, because the payments corresponded to the number of years worked rather than the forfeiture of a due process right. *Id.* While the tenure-qualification process at issue was more rigorous, *id.* at 606, Michigan law similarly recognizes tenure as a property right and provides procedural safeguards, qualifications, and protections for the tenure rights of public school teachers. *See Tomiak v. Hamtramck Sch. Dist.*, 397 N.W.2d 770, 780 (Mich. 1986); *see also Klender*, 328 F. Supp. 2d at 765-67 (discussing laws that govern the process of tenure in Michigan).

Although *North Dakota* is not controlling authority in this Circuit, the decision is entitled to considerable deference. *See Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 181 (6th Cir. 2003) ("'Uniformity among the circuits is especially important in tax cases to ensure equal and certain administration of the tax system. We would therefore hesitate to reject the view of another circuit.'" (quoting *Nickell*, 831 F.2d at 1270)).

In addition to *North Dakota*, the District Court for the Western District of Pennsylvania recently held that early retirement incentive payments made to tenured faculty and administrators at the University of Pittsburgh were not subject to FICA taxes. *Univ. of Pittsburgh v. United States*, No. 04-1616, 2005 WL 3619245 (W.D. Pa. Oct. 18, 2005) (magistrate decision), *adopted*, November 21, 2005. Analyzing virtually indistinguishable circumstances, the court found the

---

[6]Although the majority attempts to distinguish the facts, particularly on the issue of tenure, the salient fact – a statutorily protected due process consideration – renders the cases materially indistinguishable. This is evident from the Eighth Circuit's distinction between tenured and non-tenured employees who had the same number of years of service.

rationale of *North Dakota* persuasive, holding that: (1) no "service" was rendered in exchange for the payments, thus rendering the payments an exchange for the "relinquishment of protected property rights," *id.* at \*\*11-12; and (2) non-tenured faculty members offered the same payments were subject to FICA taxation, as they possessed only an "expectation of continuing employment," *id.* at \*12.

Finally, in this appeal, the district court opinion in *Klender* offers a well-reasoned analysis in support of its conclusion that the contested payments are not subject to FICA taxation. *Klender*, 328 F. Supp. 2d at 760-67.

V.

The majority relies on Revenue Rulings to buttress its conclusion that the ESP payments are subject to FICA taxation. However, the Revenue Rulings at issue, which are persuasive authority at best, do not preclude the conclusion that the subject ESP payments are not taxable pursuant to FICA. *See Aeroquip-Vickers, Inc.*, 347 F.3d at 180 (holding that revenue rulings are not entitled to *Chevron* deference (i.e. when a non-arbitrary agency regulation controls) but are reviewed under the *Skidmore* standard (i.e. regulations have the power to persuade, as they are the official IRS interpretation, but do not control); *North Dakota*, 255 F.3d at 604 n.6 ("[R]evenue rulings do not have the force of law, [but] they are entitled to respectful consideration . . . .") (internal quotation omitted).

The parties cite four Revenue Rulings – 58-301, 74-252, 75-44, and 2004-110 – as relevant to this case. The courts in *North Dakota* and *Pittsburgh* relied on three of these rulings – 58-301, 74-252, and 75-44. Although Ruling 2004-110 generally supports the government's position, plaintiffs contend that it was promulgated in anticipation of litigation.[7]

In Revenue Ruling 58-301, the IRS determined that FICA taxes were not owed on a lump-sum payment received by an employee as consideration for the early termination of his five-year employment contract. 1958-1 C.B. 23, 1958 WL 10630. The IRS further determined that the employee received the lump-sum payment in exchange for the relinquishment of his contractual rights (i.e., to be employed for the full five years) and therefore not subject to FICA taxation. *Id.*

In contrast, however, the IRS concluded in Revenue Ruling 74-252, that payments made to an employee to unilaterally terminate his three-year employment contract were taxable as FICA wages because the contract gave the employer the right to terminate the contract at any time, so long as the employer paid the employee an additional six-month salary, which it did. 1974-1 C.B. 287, 1974 WL 34867. The Ruling distinguished 58-301 by noting that, in 74-252, the employee received payment pursuant to an already-present employment contract. *Id.*

In the instant case, I would hold that the ESP payments are most like the payments in Ruling 58-301, as they did not arise from the employment contract. Indeed, the ESP payments are ultimately distinguishable from either Ruling, as they were made in exchange for an entirely separate statutory right.

Finally, in the case that the majority finds most persuasive, Revenue Ruling 75-44 held that a lump-sum payment given to a railroad employee to buy-out his seniority rights earned pursuant to a general employment contract was taxable under the Railroad Retirement Tax Act (FICA's

---

[7]Plaintiffs note that Ruling 2004-110 specifically states that it would not apply to payments made by an employer prior to January 12, 2005. Plaintiffs' observation is well-taken; even if the Court were persuaded by this Ruling, a large portion of plaintiffs' payments would remain unaffected because the ESP payments predate its applicability. (Rev. Rul. 2004-110, 2004-50 I.R.B. 960, 962)).

counterpart for railroad employees).    1975 C.B. 15, 1975 WL 34658.    After noting that the employee was only an at-will employee, but received higher pay as a result of his seniority rights, the IRS concluded that this remuneration compensated the employee exclusively for past services earned.  *Id.*  However, Ruling 75-44 is distinguishable from the present case because plaintiffs' rights in this case arise not from their employment contract, but rather from state law.  Indeed, because of the rights bestowed by Mich. Comp. Laws § 38.101, plaintiffs possessed an alternative source of consideration, and, accordingly, the school districts had an alternative basis for providing ESP payments.

## VI.

For the foregoing reasons, with the exception of William Rase, I would hold that the ESP payments to the Michigan teachers do not constitute "wages" for purposes of FICA.  Accordingly, I would affirm the grant of summary judgment in favor of plaintiffs in *Klender* and reverse the grant of summary judgment in favor of the United States in *Appoloni*.